IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOHN L. LOTTER, | ) | |
| | ) | |
| Petitioner, | ) | 4:04CV3187 |
| | ) | |
| V. | ) | |
| | ) | |
| ROBERT HOUSTON, Warden, | ) | MEMORANDUM |
| Tecumseh State Correctional Center, | ) | AND ORDER |
| | ) | |
| Respondent. | ) | |
| | ) | |

John L. Lotter ("Lotter" or "Petitioner") seeks a writ of habeas corpus. His petition will be denied, and this matter will be dismissed with prejudice.

## I. BACKGROUND

Lotter was convicted on three counts of first degree murder, three counts of use of a weapon to commit a felony, and one count of burglary. He was sentenced to death for each murder conviction and to not less than 80 months nor more than 20 years of imprisonment for each use of a weapon conviction and the burglary conviction.

### The Murders

Teena Brandon moved to Richardson County, Nebraska, in the fall of 1993. Brandon was a woman but had been presenting herself as a man by the name of "Charles Brayman." Brandon became acquainted with Lotter and Thomas M. Nissen through a mutual friend and had attended parties with them. Lotter and Nissen later

discovered that Brandon was a woman. Angry that they had been deceived, on December 25, 1993, they drove Brandon to a rural area and raped her in Lotter's car.

Nissen testified on behalf of the State and gave the following account. On Christmas Day 1993, Lotter and Nissen learned that Brandon had reported the rape to the police and began discussing ways to silence Brandon. By December 26, they had decided to kill her.

Nissen and Lotter drove to Lincoln, where they had reason to believe they would find Brandon. They brought a hatchet and some nylon rope, and each brought a change of clothing. According to Nissen, they planned to use the hatchet to chop off Brandon's head and hands so that her body would be difficult to identify. However, their plan went awry when they were unable to locate Brandon.

Having failed to locate Brandon on December 26, 1993, Nissen and Lotter continued to plan Brandon's murder. On December 28, Nissen and Lotter were questioned by Officer Keith Hayes of the Falls City Police Department concerning the allegations stemming from Brandon's rape.

On December 30, 1993, Nissen and Lotter went to the house of Lotter's mother, where Lotter picked up two pairs of gloves. They next went to Bill Bennett's house, where Lotter stole Bennett's handgun. After retrieving the handgun, Nissen and Lotter drove to Linda Gutierres' house to look for Brandon. Apparently thinking that Brandon was at the Gutierres residence, they put on the gloves and Lotter handed Nissen a knife. Lotter had the handgun in his hand as they walked to the door.

Although Brandon was not at the Gutierres residence, Gutierres did tell Nissen and Lotter that Brandon was staying at Lisa Lambert's house near Humboldt, Nebraska. Nissen and Lotter then proceeded to Humboldt to kill Brandon.

At approximately 1 a.m. on December 31, 1993, Nissen and Lotter drove Lotter's car to Lambert's residence. Nissen drove while Lotter gave directions. Along the way, they drove by the deputy sheriff's home, apparently to ascertain whether the deputy would be on patrol that night.

When they reached Lambert's residence, Nissen drove down a long gravel driveway and parked the car by the side of the house. Both were wearing gloves when they got out of the vehicle. Lotter was armed with Bennett's handgun and a knife.

After pounding on the door and getting no response, Lotter kicked in the door and they entered Lambert's home. They entered the bedroom, where they encountered Lambert, who was lying on a waterbed, and her baby, who was in a crib.

Nissen asked Lambert where Brandon was and then noticed there was a person under a blanket on the floor at the foot of the bed. Removing the blanket, Nissen discovered Brandon, who apparently had been trying to hide. Nissen grabbed Brandon by the arm and stood her up. Lotter then shot Brandon, who fell on the bed. Brandon continued to twitch after being shot, so Nissen proceeded to ensure that she was dead by retrieving the knife from Lotter and stabbing Brandon in the abdomen.

After he stabbed Brandon, Nissen picked up the baby and handed the baby to Lambert. As soon as Nissen handed Lambert the baby, Lotter raised the pistol and shot Lambert in the stomach area, but the shot did not kill her. Nissen grabbed the baby and put him back in the crib.

While Lambert was still alive, Nissen asked her if anyone else was in the house. Lambert indicated that Phillip DeVine was present, so Lotter left the room to find DeVine.

Lotter returned to the room with DeVine and shot Lambert again, this time in the eye. DeVine, who had been pleading for his life, was led back to the living room at Nissen's suggestion. Nissen told DeVine to sit down, and DeVine complied by sitting on the couch. As soon as DeVine sat down, Lotter shot him twice.

Lotter then went back to Lambert's bedroom. The record indicates Lotter fired two or three more shots to ensure that everyone was dead. Nissen then went back to the bedroom and suggested that he and Lotter leave. Nissen and Lotter then left the house.

Nissen drove himself and Lotter back to Falls City. During the return trip to Falls City, Lotter threw the knife and a box containing the handgun into the Nemaha River. When they arrived in Falls City, Nissen and Lotter went to Nissen's house, where Nissen's wife, Kandi Nissen, and Rhonda McKenzie, Lotter's girlfriend, were staying. Nissen washed his hands with Clorox because he did not have his gloves on when he stabbed Brandon. Nissen and Lotter then informed Kandi Nissen and McKenzie that if anyone asked, they were home at 1 a.m. It was approximately 3 a.m. at that time.

*Nissen's Testimony Compared To The "Other" Evidence*

Prior to Lotter's trial, Nissen was convicted in a separate trial of first degree murder in the death of Brandon and second degree murder in the deaths of Lambert and DeVine. Nissen did not testify at his own trial, but, literally, on the eve of Lotter's trial, he made a deal and testified against Lotter. While Nissen's testimony was extremely important to the prosecutor's case against Lotter, it is also true that the "other" evidence against Lotter was compelling.

A summary of some of that "other" evidence was provided by Lotter's appellate counsel in the direct appeal brief. In part, that *defense* summary included the following descriptions of the evidence which I quote:

* "Michael Lang and his fiancé, Carrie Gross, lived with Lisa Lambert from August to December of 1993. At approximately 10:00 p.m. on December 30, 1993, Mr. Lang went to the Lambert residence to take a shower following a game of basketball. He left around 11:30 p.m. and observed no one else at the residence, except Teena Brandon, Phillip DeVine, Lisa Lambert and Ms. Lambert's baby. The front door was not damaged at that time." (Filing No. 49-17 at CM/ECF p. 40.)

* "At approximately 10:00 a.m. on December 31, 1993, Anna Mae Lambert, the mother of Lisa Lambert, went to her daughter's residence. The inside door was open and she could hear a baby crying. A man was slumped by the couch. She saw her daughter on the bed and knew something was wrong. She got a bottle for the baby and called authorities." (*Id.* at 41.)

* "Raymond Harrod, a Richardson County deputy sheriff, arrived at the Lambert residence at 10:13 a.m. There were signs that the front door had been forced open. The body of a black male was slumped on the couch with one of his legs propping up on an end table. There were two more bodies in the west bedroom." (*Id.*)

* "Dr. Blaine Roffman performed all three autopsies. Phillip DeVine had two bullet wounds to the head and died of severe brain damage. . . . Teena Brandon had two gunshot wounds to the head, one to the eye and one to the jaw. There was a stab wound to the right chest level of the tenth rib that penetrated the liver. Death was caused by either of the head wounds as the result of subarachnoid hemorrhage, brain hemorrhage, and brain disruption. . . . Lisa Lambert had two gunshot wounds to the head and one superficial graze type entrance and exit wound over her right anterior chest. Except for the superficial chest wound, either of the head wounds would have been fatal." (*Id.*)

\*      "Seven .380 cal. bullets and six shell casings were recovered from the residence, a mattress, a pillow, and the bodies of the victims." (*Id.*)

\*      "Shortly after midnight on January 1, 1994, police officers recovered one pair of gloves, a box containing a handgun, and a buck knife with the name 'LOTTER' written on the sheath from the ice of the Nemaha River just south of Falls City." (*Id.* at 42.)

\*      "William Bennett had purchased the .380 cal. handgun in late 1993 and kept it in a dresser in his bedroom." (*Id.*)

\*      "Mark Bohaty, a firearms and tool mark expert, testified . . . .  His opinion was that all of the recovered bullets came from that handgun.*"* (*Id.*)

\*      "Terry Lotter, Mr. Lotter's father, identified the knife as his and explained that he had printed his name on it with a magic marker. . . . He testified that the gloves were similar to the type he kept at home." (*Id.*)

\*      "The buck knife tested positive for human blood, type 'A,' the same type as both Mr. Lotter and Teena Brandon." *(Id.*)

\*      "On December 28, 1993, Ofc. Keith Hayes interviewed both Mr. Lotter and Mr. Nissen at the Falls City Police Department.  Mr. Lotter was told there were allegations made by Teena Brandon that she had been raped, kidnaped, and assaulted and that Mr. Lotter was a suspect.  The interview ended about 10:30 a.m. and Mr. Lotter was released." (*Id.* at pp. 42-43.)

\*      "Rhonda McKenzie has a daughter with Mr. Lotter and dated him until January 6, 1995.  On December 24, 1993, she went to a party at Nissen's home.  Teena Brandon and Lana Tisdel were in the bathroom when joined by Nissen and Mr. Lotter." (*Id.* at 43.)

\*      "Linda Gutierres lived at 724 West 21st Street in Falls City and was the mother of Lana Tisdel, Leslie Tisdel, and Terry Torrence.  At 6:00 a.m.

on December 25, 1993, Teena Brandon came to her home with no shoes or coat and her back was scratched and red. . . . ." ( *Id.*)

* "Steve Scholl worked at the Coastal Mart in Falls City as the night manager on December 30, 1993. Mr. Lotter and Nissen came to the station in a green LTD between 7 and 8 p.m. They came back about one hour later." (*Id.*)

* "At about 10:30 p.m. on December 30, 1993, Jim Morehead was visiting with his fiancé, Carmen Miller, at Camp Rulo, a restaurant/bar in Rulo, Nebraska. About a half hour before midnight, Mr. Lotter said something about how they had been in prison, and that if he ever went back again, he would probably be an old man when he got out." ( *Id.*)

* "Marcel Varga lived at 1908 Wilson with Donna Lotter and Bill Lotter, Mr. Lotter's brother. At approximately midnight, she saw John Lotter coming out of one of his mother's back bedrooms. " (*Id.* at 43-44.)

* "Mr. Lotter went to William Bennett's home on the evening of December 30 between midnight and 1 a.m." ( *Id.* at 44.)

* "Later, Mr. Bennett found that his back door had been 'busted.' The last time Mr. Bennett saw the gun was on the early morning of December 30 in his dresser drawer." (*Id.*)

* "Rhonda McKenzie testified that on December 30, 1993, she went to Nissen's home about 10 after midnight and fell asleep on the floor. She was awakened about 1 or 1:30 a.m. by Mr. Lotter who said they had to go over to Lana Tisdel's. She went back to sleep and was awakened about 2:00 or 2:30 a.m. . . . According to Ms. McKenzie, Mr. Lotter said, 'If anybody - if any of the cops come and ask you any questions, to tell them we got back between 12:30 and 1:00.'" (*Id.*)

* "Kandi Nissen testified that on December 30, 1993, Nissen and Mr. Lotter left her house about 9:30 or 10:00 p.m. She next saw them that evening about 12:30 to 1:00 a.m. Nissen and Mr. Lotter returned about five minutes after 3:00 in the morning and Kandi Nissen had to unlock

the back door so that they could get in.  She was told to say that Nissen and Mr. Lotter went to Lana Tisdel's and had come back about 12:30 or 1 p.m.  However, she said that it was not true that they had come back to stay at that time."  (*Id.*)

&ast;    "Ms. Gutierres testified that on the evening of December 30, Nissen and Mr. Lotter showed up about 1 a.m.  Both Nissen and Mr. Lotter were wearing gloves when they arrived. . . . [T]hey talked about Phillip and Leslie having a fight and that Phillip went to Humboldt to stay with Lisa and Brandon."  (*Id.* at 44-45.)

&ast;    "Terry Torrence testified that on December 30, 1993, he was downstairs playing a game with his friend, Lenny Landrum, and his sisters, Lana and Leslie Tisdel. . . . Mr. Lotter came downstairs and, after about 10 minutes, said, 'I feel like killing somebody.'"  (*Id.* at 45.)

&ast;    "Lana Tisdel reported to police that she had carried on a sexual relationship while Teena Brandon had posed as a male.  She was upset and distraught when she learned that Teena was a female."  (*Id.*)

&ast;    "Lana Tisdel claimed to have also heard the statement that Mr. Lotter said, 'I feel like killing somebody.'"  (*Id.* at 46.)

There is no doubt that the  prosecutor's case was strengthened by Nissen's belated agreement to cooperate and testify, but the State's case did not turn solely on Nissen's testimony.  The "other" evidence–including evidence that Lotter likely stole the gun that killed the victims, that Lotter likely obtained the gloves used in the murders, that Lotter likely obtained the knife (with his last name written on it) which was probably used to stab one or more of the victims, that Lotter made a statement expressing a desire to kill someone on the night of the murders, and that Lotter made multiple statements regarding the creation of false stories about his whereabouts at the time of the murders–painted a damning picture.  This additional evidence also corroborated much of Nissen's testimony.

*The Trial and the Direct Appeal*

On Monday morning, May 15, 1995, after voir dire and prior to opening statements in Lotter's trial, the following exchange occurred outside the presence of the jury:

> THE COURT (Judge Finn): With regard to [Nissen's] Motion to Quash, I had a conversation last night with [Nissen's counsel] and defense counsel . . . . Or prosecution, yes. Excuse me. Now, I'm gonna let them explain to you what's goin'-what the nature of that was, because I think you're entitled to know, in view of your Motion [in Limine]. Okay.

> [PROSECUTION]: Uh-we're negotiating an agreement that would have him testify in this matter; it's not been finalized.

> THE COURT: It has not been finalized?

> [PROSECUTION]: No. Oh, yeah, that's right. The-and [Nissen's counsel], I think, agreed to continue his Motion to Quash until such time as Nissen would be called, I think that's the extent of it.

Quoted in *State v. Lotter*, 586 N.W.2d 591, 604 (Neb. 1998), *modified on denial of rehearing* 587 N.W.2d 673 (Neb. 1999), *cert. denied*, 526 U.S. 1162 (1999).

Lotter's counsel moved for a continuance to take Nissen's deposition and to delay opening statements until it was known whether Nissen would testify. The trial court denied the continuance. Later, during post-conviction proceedings, Lotter's counsel testified that this exchange was the first time he had any knowledge of an agreement that would secure Nissen's testimony at Lotter's trial.

On May 17, 1995, during his direct examination, Nissen testified to his understanding of his sentencing agreement. Nissen stated: "There won't be a death sentence hearing." When asked whether he was going to be put to death, Nissen said,

"No." Nissen also testified that he signed a document memorializing the agreement early Monday morning and that his attorney had a copy of the document. He did not mention that two felony charges against him were dropped.

Nissen's deposition had been taken on May 16, 1995, but it had not been transcribed. Prior to Nissen's direct examination, Lotter's defense counsel again moved for a continuance until he received the deposition transcript. The court denied the continuance but did provide that defense counsel would not be forced to cross-examine Nissen without having a transcript of the deposition. The transcript was completed that afternoon, and cross-examination was conducted that same day.

On May 18, 1995, the day after Nissen's testimony, defense counsel informed the trial court that he had requested a copy of the document evidencing Nissen's sentencing agreement from the prosecution but was told that he had no right to that document. The judge indicated that he desired that a copy of the document be put in both the Nissen and the Lotter files. The prosecution responded by stating: "Well, I'm-I'm not gonna file it I guess is my position." Shortly thereafter, the prosecution denied having a copy of the document evidencing the agreement.

After further discussion, the prosecution admitted that Nebraska State Patrol Investigator Roger Chrans did indeed have a copy of the document. For whatever reason, Chrans later testified that the copy he said he had on May 18 was the "wrong copy." According to Chrans, the version of the document that was eventually filed came from the county attorney. Nonetheless, defense counsel did obtain a copy of the document from Nissen's file sometime on May 18.

The document evidencing the agreement stated in pertinent part:

1.     The State of Nebraska agrees not to pursue the death penalty at the sentencing of Marvin Thomas Nissen. The State will not present any

evidence of any aggravating circumstances in connection with Mr. Nissen's sentencing, and the State will not acquiesce to the convening of a three judge panel. Prior to the finalizing of any agreement, the State will be party to a meeting between attorneys and Judge Finn wherein the State will inform the judge of no need for the convening of a three judge panel or the preparation of a presentencing report that may contain evidence of aggravating circumstances. If the judge agrees to do so, the State does not object to the parties receiving an assurance that Judge Finn would not convene a three judge panel and would impose life sentences upon Mr. Nissen.

. . .

3.     All other pending charges against Mr. Nissen will be dismissed without prejudice and will not be re-filed except in the event of non-compliance with this Agreement by Mr. Nissen and no new charges will be instituted concerning the events . . . which occurred on December 24, 1993 through and including December 31, 1993.

4.     Mr. Nissen will agree to testify against John L. Lotter, or any other individual when requested to do so by the State in any criminal proceedings. . . .  He will give complete and truthful testimony and answer all prosecution inquiries to the best of his ability and the State agrees that no testimony or other information or any information directly or indirectly derived from such testimony or other information may be used against Mr. Nissen in any criminal case except in prosecution for perjury or giving a false statement.

. . .

6.     Once this agreement has been entered into, Mr. Nissen will give a full and complete recitation of the events leading to the executions of Teena Brandon, Lisa Lambert, and Phillip DeVine. . . . The primary interviewer will be Investigator Roger L. Chrans of the Nebraska State Patrol. Investigator Chrans will be instructed to immediately terminate the interview if in his opinion Mr. Nissen is in any way evasive or untruthful in his responses to Investigator Chrans' questions. . . .  In the

event that the interview is terminated for these reasons the aforementioned agreement is to be immediately declared null and void and the matter will proceed to sentencing. . . .

7.    For the safety of the Defendant and as soon as is practicable, the State of Nebraska will assist and make all reasonable efforts to have Mr. Nissen transferred while awaiting sentencing or upon the imposition of sentence imposed by the District Court to an institution in another State.

Quoted in *Lotter*, 586 N.W.2d at 605-606.

There was a typed dateline on the document evidencing the agreement, indicating that it had been signed on May 15, 1995. After the period following the typed "1995," the time was handwritten as "9 24 PM," and the document was initialed "JE."

Nissen gave his first interview to Chrans from approximately 1:00 to 4:45 a.m. on Monday, May 15, 1995. Chrans conducted a second interview that same day beginning at about 6:30 p.m. and lasting until approximately 10:00 p.m.

Nissen testified that he stabbed Brandon but that Lotter fired the shots that killed all three victims. Lotter testified in his own defense at trial. He denied any participation in either the planning or perpetration of the murders and stated that he was not present when they were committed. He testified that Nissen had not been truthful in his testimony regarding Lotter's involvement in the crimes and that other witnesses who gave incriminating testimony against him were either lying or mistaken.

The jury found Lotter guilty. In February 1996, a three-judge panel (that included Judge Finn, the trial judge) sentenced Lotter to death. The sentencing panel's opinion was 48 pages long, and it was very thoughtful. (Filing no. 49-36 at CM/ECF pp. 230-277.)

On direct appeal, the Nebraska Supreme Court affirmed the murder convictions and capital sentences, as well as the convictions and sentences on the related weapons charges. In general, Lotter argued that he was denied a fair trial because the trial court engaged in an ex parte communication, the prosecutor committed misconduct, the jury was improperly selected and not sequestered, the jury was improperly instructed, trial counsel was ineffective, and the death penalty was improperly imposed. The Nebraska Supreme Court concluded that Lotter's burglary sentence must be vacated[1], but it also decided that Lotter's other assignments of error were without merit.

In the modified opinion, the Nebraska Supreme Court decided that Lotter had not waived his claim that the ex parte meeting between Judge Finn and the prosecutor and Nissen's counsel violated due process standards. Despite the lack of a waiver,

> After evaluating Lotter's due process claim, we find it to be without merit. While the threat to the impartiality of the trial judge in this case, as noted above, would be sufficient under Nebraska law to require the judge's recusal upon request, it is not sufficient, under the Due Process Clause, to suggest that the trial judge "had such a strong personal or financial interest in the outcome of the trial that he was unable to hold the proper balance between the state and the accused." [citation omitted.]
>
> Moreover, our comprehensive review of the record in this case reveals no evidence of actual bias on the part of the trial court. Absent an instance of actual bias on the part of the trial court, we determine that Lotter's due process right to a fair and impartial judge was not violated. *See Dyas III*. Lotter's assignment of error is meritless.

---

[1]Based upon the concession of the Nebraska Attorney General, the Nebraska Supreme Court concluded that the burglary conviction merged into the murder conviction such that the separate burglary sentence must be vacated so as to avoid any double jeopardy concerns. *Lotter*, 586 N.W.2d at 633.

*Lotter,* 587 N.W.2d at 675.

The reference to *Dyas III* related to *Dyas v. Lockhart*, 878 F.2d 1105 (8th Cir. 1989). After several appeals, the Eighth Circuit Court of Appeals ultimately affirmed a federal district court's determination that there was no evidence of actual bias on the part of a trial judge in a murder case. The fact that there was a family relationship between the prosecutors of the murder case and the trial judge (the trial judge was the uncle of the prosecutor and the brother and father of deputy prosecutors who participated in the case) was insufficient to establish actual bias. *Id. See also Dyas v. Lockhart*, 771 F.2d 1144 (8th Cir. 1985); *Dyas v. Lockhart*, 705 F.2d 993 (8th Cir. 1983).

*1999 Postconviction Action(s)*

On August 3, 1999, Lotter filed pro se verified motions for postconviction relief in each of the murder cases. In those motions, he alleged as grounds for relief (1) that the trial judge engaged in improper ex parte communication, (2) that this court on direct appeal had created a new duty on the part of trial counsel to move for the trial judge's recusal, (3) that his trial counsel was ineffective for failing to move for recusal of the trial judge, and (4) that trial counsel was ineffective for failing to make various evidentiary objections. Lotter requested the appointment of counsel on the same date.

On November 16, 1999, the district court (Judge Bryan) conducted a "preliminary review" of the motions and concluded that Lotter was entitled to an evidentiary hearing on the third and fourth grounds, relating to ineffective assistance of counsel, but was not entitled to an evidentiary hearing on the other grounds. The court also appointed counsel to represent Lotter in the postconviction proceeding.

On December 9, 1999, Lotter, through his appointed counsel, moved to consolidate the three cases and filed an amended motion for postconviction relief in

the consolidated proceeding, asserting three additional grounds. Two of the additional grounds were based upon an affidavit of Jeff Haley, who had at one time shared a cell with Nissen. Haley's affidavit was attached to the amended postconviction motion. Haley averred that while they were incarcerated together, Nissen told Haley that he, not Lotter, had fired the shots that killed all three victims. Lotter alleged that this evidence established that his convictions and sentences were obtained through the knowing use of false testimony and were therefore invalid. As an additional ground, Lotter alleged that death by electrocution is unconstitutional. At the same time that he filed his amended motion for postconviction relief, Lotter filed a motion for writ of error coram nobis in the consolidated proceeding, asserting that the statements made by Nissen to Haley were exculpatory both as to Lotter's guilt or innocence and as to his sentences. He also filed a motion for new trial in the consolidated proceedings, based upon the statements allegedly made by Nissen to Haley.

On December 16, 1999, the district court conducted a "preliminary review" of the amended postconviction motion. Among other things, the court held that Lotter was also entitled to an evidentiary hearing on the claim related to Haley's affidavit, but not upon the ground alleging that the death penalty was unconstitutional.

The evidentiary hearing commenced on October 26, 2000, and was completed on November 22. Lotter's motions for a writ of error coram nobis and for a new trial were joined for consideration at the hearing. Lotter's trial counsel was questioned and testified about the fact that he did not object to various evidentiary matters. Trial counsel also testified that at the time of trial, he had no knowledge of an ex parte communication between the prosecution and the trial judge. Counsel testified that he interpreted the reference on the record to a communication with the judge regarding Nissen's testimony as merely a procedural matter. He further testified that he interpreted the provision in the State's agreement with Nissen which referenced a meeting with the judge as referring to a meeting that would take place in the future,

prior to Nissen's sentencing. Counsel testified that although the trial judge was generally ruling in Lotter's favor on many issues, he would have moved to recuse if he had known all of the facts regarding arrangements to secure Nissen's testimony against Lotter.

Haley's deposition, taken on October 18, 2000, was offered into evidence for substantive purposes under the penal interest exception to hearsay, Neb.Rev.Stat. § 27-804(2)(c) (Reissue 1995). The State objected to the admission of the evidence based upon relevancy, foundation, and hearsay. The objections were taken under advisement.

Haley testified in his deposition that he was Nissen's cellmate at the Lincoln Correctional Center in 1997. Nissen was reading a book at that time about the Brandon murder and was upset because he felt it contained lies. According to Haley, Nissen showed him the autopsy photographs of the victims and explained and demonstrated in detail how he had shot and killed all three victims. Nissen told Haley that while Nissen was shooting the victims, Lotter was "freaking out and running around," saying, "What are you doing? What are you doing?" According to Haley, Nissen stated that he should have shot Lotter as well, and then there would have been no witnesses.

Lotter attempted to depose Nissen and offer his testimony at the postconviction hearing. On October 23, 2000, Nissen refused to answer deposition questions without an attorney regarding his statements to Haley and his involvement in the murders. After Lotter filed a motion to compel, the district court held that Nissen had no right to an appointed attorney but could retain one at his own expense. The court further ruled that Nissen was bound to answer all questions unless he properly claimed a recognized privilege.

On October 31, Lotter again attempted to depose Nissen. Nissen again refused to answer questions, stating that he was in the process of hiring an attorney. On November 14, Lotter attempted to depose Nissen for the third time. At that time, Nissen asserted his Fifth Amendment privilege against self-incrimination and refused to answer questions relating to his statements to Haley or his involvement in Lotter's trial and the murders. At the conclusion of the postconviction evidentiary hearing, Lotter made an oral motion requesting the court to determine that Nissen had no basis for asserting the privilege and to compel Nissen to answer all questions.

On December 19, 2000, the district court entered its order. With respect to the postconviction claims, the court denied Lotter's ineffective assistance claim based upon trial counsel's failure to move for the recusal of the trial judge, reasoning that trial counsel's failure was based upon strategy and resulted in no prejudice. The court also denied Lotter's ineffective assistance of counsel claims based on the failure to make proper evidentiary objections, finding that Lotter was not prejudiced by any deficient performance of his trial counsel.

The court also determined that the statements made by Nissen to Haley did not fall within the Nebraska penal interest exception because there were no corroborating circumstances that clearly indicated the trustworthiness of the statements.[2] Because it held that Haley's testimony was thus inadmissible, the court held that Lotter's claim alleging the improper use of Nissen's testimony lacked merit. The court also held that because Nissen could be exposed to a first degree murder charge if Lotter were to be executed on the basis of Nissen's alleged perjured testimony at Lotter's trial, there was a sufficient basis to honor Nissen's claim of Fifth Amendment privilege and

---

[2]This decision was consistent with a Nebraska evidence rule which provided that a "statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Neb.Rev.Stat. § 27-804(2)(c) (Reissue 1995). This rule is similar to Federal Rule of Evidence 804(b)(3)(B).

he could not be compelled to answer the deposition questions. With respect to the motion for writ of error coram nobis, the court denied relief, concluding that Lotter had not shown that an alleged error of fact with respect to the identity of the actual shooter would have prevented Lotter's conviction. The district court also denied Lotter's motion for new trial.

Lotter then perfected timely appeals. The Nebraska Supreme Court issued its opinion on July 11, 2003. *State v. Lotter*, 664 N.W.2d 892 (Neb. 2003), *cert. denied*, 542 U.S. 939 (2004). The Supreme Court held that: (1) the *Ring* decision[3]–holding that an aggravating factor necessary for imposition of death sentence must be found by a jury–did not apply retroactively; (2) deposition testimony of a cellmate as to Nissen's purported statements about the murders were inadmissible under the hearsay exception for statements against penal interest; (3) the risk to Nissen of being exposed to a separate first degree murder charge was sufficient to honor his assertion of Fifth Amendment privilege; (4) even if Nissen testified falsely at Lotter's murder trial, this fact would not entitle Lotter to a writ of error coram nobis; (5) the district court could deny postconviction relief without an evidentiary hearing as to issue of improper ex parte communications between the trial judge and the prosecution; and (6) Lotter failed to establish that trial counsel's performance was ineffective.

*2001 Postconviction Action*

On December 20, 2001, Lotter filed a pro se motion for DNA testing pursuant to Nebraska's DNA Testing Act. At the direction of the district court (Judge Bryan), the State filed an inventory listing several items containing biological evidence. In response to a motion for summary dismissal filed by the State, counsel for Lotter filed an amended motion for DNA testing. The State's motion for summary dismissal was overruled, and Lotter was granted a hearing on his amended motion.

---

[3] *Ring v. Arizona*, 536 U.S. 584 (2002).

In Lotter's amended motion for DNA testing, he alleged that he intended to utilize the "PowerPlex 16" amplification and multiplex identification system with the "ABI Prism 310 Genetic Analyzer" to test items containing biological evidence, including a pair of yellow work gloves; cuttings taken from the gloves; Nissen's shoes and clothing; and known comparison blood samples from the murder victims, Teena Brandon, Lisa Lambert, and Phillip DeVine. Lotter alleged that evidence of high-velocity blood spatter from Brandon or the presence of DNA from Lambert and/or DeVine on Nissen's gloves, shoes, or clothing would establish that Nissen was not in the locations that he described in his trial testimony. Lotter further alleged that DNA tests would establish that Nissen lied during his testimony and that Nissen, not Lotter, was holding the gun at the time all three victims were murdered.

Evidence at Lotter's trial indicated that the yellow work gloves worn by Nissen at the time of the crime contained two areas that tested positive for blood. The serologist did not conduct additional tests because further testing would have consumed the sample and the serologist had been instructed by defense counsel to preserve the evidence for independent analysis.

Prior to the hearing on Lotter's amended motion for DNA testing, he filed an application for writ of habeas corpus ad prosequendum, requesting that he be allowed to attend the hearing. The district court denied the application, and the hearing proceeded in Lotter's absence.

At the hearing on his amended motion for DNA testing, Lotter submitted the affidavit of Ronald Rubocki, Ph.D., and portions of the trial record relevant to his motion. The State submitted the affidavit of Charlotte Word, Ph.D., and the bill of exceptions from Lotter's trial and postconviction proceedings. Judge Bryan denied Lotter's amended motion for DNA testing, concluding that such testing would not result in noncumulative, exculpatory evidence relevant to any claim that Lotter was wrongfully convicted or sentenced.

On September 26, 2003, the Nebraska Supreme Court affirmed. *State v. Lotter*, 669 N.W.2d 438 (Neb. 2003). Among other things, the Nebraska Supreme Court decided the evidence did not support a finding that Lotter's request for postconviction DNA testing would have produced noncumulative, exculpatory evidence relevant to a claim that Lotter was wrongfully convicted so as to entitle him to such testing. This was true even though Lotter claimed that blood spatter evidence from the victims on Nissen's gloves or clothing would have established that Nissen was close to the victims and was the shooter. While DNA testing might have shown that DNA from any or all of the three victims was present on Nissen's gloves or clothing, testing could not establish exculpatory evidence because it could not establish how the blood was deposited on Nissen's gloves or clothing.

*2003 Postconviction Action*

Although there is no published opinion regarding it, Lotter brought a third postconviction action on October 15, 2003, but his request for relief was denied without an evidentiary hearing. (Filing no. 79 at CM/ECF pp. 16-17 citing to filing nos. 52-2 through 52-5.) The issues raised by Lotter (recounted in a brief filed by the Nebraska Attorney General) were described this way:

> In his Motion for Post-Conviction Relief, Lotter alleged that he was denied the effective assistance of counsel, both on direct appeal and during his original postconviction proceedings. Specifically, in paragraph 6 of his postconviction petition, Lotter asserted that his counsel:
>
> > A.) failed to present evidence obtained as the result of postconviction discovery pertaining to Lotter's co-participant in the murders, Marvin Thomas Nissen, and his purported history of fabrication and making threatening statements;

B.)    failed to allege prosecutorial misconduct based on an alleged failure to disclose documents to Lotter's trial attorneys pertaining to Nissen's purported history of fabrication, making threatening statements, and mental health history;

C.)    failed to depose Nissen's stepmother or call her as a witness regarding Nissen's purported history of fabrication and blaming others for his own actions;

D.)    failed to depose police officers with knowledge regarding Nissen's purported history of fabrication and making threatening statements;

E.)    failed to raise any claim based on *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002), in any filings with the Nebraska courts; and

F.)    failed to assert any "actual innocence" claim.

Lotter did not specify which ineffectiveness claims related to his direct appeal versus the postconviction proceedings. However, subparagraphs A, B, C, D and F all appear to relate to the decisions made by postconviction counsel. Subparagraph E could be related to Lotter's direct appeal as well as his original postconviction petition.

(Filing no. 52-3 at CM/ECF p. 6.)

The district court (Judge Bryan) ruled that Lotter had no constitutional right to counsel in the postconviction proceedings and that, even assuming the truth of Lotter's allegations, counsel on the direct appeal (who was different than trial counsel) was not ineffective. (Filing no. 52-5 at CM/ECF pp. 24-27.) On April 21, 2004, the Nebraska Supreme Court summarily affirmed the denial of postconviction relief. (Filing no. 52-1.)

On March 27, 2008, Lotter filed yet another state postconviction action. (E.g., filing no. 79 at CM/ECF p. 17 citing to filing nos. 53-3 through 53-8). Lotter asserted three claims which are summarized and condensed as follows: (1) Lotter was convicted largely on the strength of Nissen's testimony, Nissen had recently recanted much of that testimony and therefore Lotter's federal constitutional rights were violated; (2) the prosecutor knew or should have known that Nissen was a liar and therefore Lotter's federal constitutional rights were violated by the prosecutor's use of Nissen; and (3) since Nissen was facing death by electrocution and that punishment is cruel and unusual, Nissen's false testimony was coerced by the State of Nebraska and therefore Lotter's federal constitutional rights were violated. (Filing no. 53-8 at CM/ECF pp. 15-21.)

Among other documents that were attached to Lotter's postconviction pleading was Nissen's affidavit dated July 23, 2007. This affidavit came more than 12 years after Nissen had testified in Lotter's trial. There was no explanation as to why Nissen had taken so long to provide the affidavit.

In pertinent part, the affidavit stated:

1.  I was a witness for the prosecution in the case of State of Nebraska vs. John L. Lotter, Richardson County District Court case number 2682, 2683 and 2684;

2.  During my trial testimony, I swore under oath that I saw John Lotter fire the gun that inflicted gunshot wounds to Teena Brandon, Philip Devine and Lisa Lambert;

3.  The testimony I gave regarding the person who fired the gun was false;

4.    I am the person who shot and stabbed Teena Brandon;

5.    I am the person who shot Philip Devine;

6.    I am the person who shot Lisa Lambert;

7.    I was in possession of the gun and fired all of the bullets that inflicted all of the gunshot wounds to those individuals;

8.    On July 11, 2007, I wrote a letter to attorney Sean J. Brennan, who I was aware had been appointed by the federal district court for the District of Nebraska to represent John Lotter in a case pending in the federal district court for the District of Nebraska. In that letter, I told Mr. Brennan that I would like to speak with him regarding Mr. Lotter's case;

9.    On July 17, 2007, I met with Mr. Brennan at the Lincoln Correctional Center in Lincoln, Nebraska. I told Mr. Brennan that my trial testimony regarding the identity of the person who inflicted the gunshot wounds was false;

10.   That I was the person in possession of the gun at the time the gun was fired and that I am the person who fired all of the bullets that inflicted all of the gunshot wounds to Teena Brandon, Philip Devine and Lisa Lambert;

. . . .

(Filing no. 53-8 at CM/ECF pp. 22-23.)

Without holding an evidentiary hearing, Judge Bryan denied Lotter relief. (Filing no. 53-8 at CM/ECF p. 2-9.) Lotter appealed and the Nebraska Supreme Court affirmed. *State v. Lotter*, 771 N.W.2d 551 (Neb. 2009), *cert. denied*, 130 S.Ct. 1900 (2010).

The Court first held that any claim that Nebraska knowingly used perjured testimony was procedurally barred because it could have been raised on direct appeal or in earlier postconviction actions. Still further, even if Nissen did perjure himself, Lotter was not entitled to postconviction relief because the "Due Process Clause guarantees a procedurally fair trial, but does not guarantee that the verdict will be factually correct." *Id.* at 562-63. Moreover, even if one assumed that Nissen's recantation was truthful, the evidence would still be sufficient to establish that Lotter was guilty and not actually innocent:

> Nothing in the allegations presented by the postconviction motion, even if true, refutes the evidence at trial that Nissen and Lotter, wearing gloves, traveled to Lambert's house in order to kill Brandon and anyone else they found there. The recantation does not refute the evidence that Lotter stole the gun used to murder the victims and that Lotter obtained the knife and the gloves worn during the crimes. It does not refute the testimony of a witness that on the evening of the murders, Lotter told the witness he desired to kill someone and that after the murders, Lotter sought to obtain an alibi. As we indicated in Lotter's appeal from the denial of his motion for DNA testing, because of the joint participation in the felony and the reckless indifference to human life, it is irrelevant to the degree of culpability by whose hand the victims actually died. And certainly, determination of this question does not make a showing of actual innocence of the crimes for which Lotter was convicted and sentenced. As such, postconviction relief based upon Nissen's recent recantation was properly denied without an evidentiary hearing.

*Id.* at 564 (footnote omitted).

The Court went on to hold there was no unconstitutional coercion of Nissen to testify by threat of electrocution because at the time of his testimony death by electrocution was constitutional. *Id.* at 564-65. Moreover,

the State's promise not to pursue that punishment was thus a legitimate promise of leniency. And, at trial, Lotter was permitted to thoroughly cross-examine Nissen regarding his motivation to testify against him, including his fear of death by electrocution. We find no merit to Lotter's argument that Nissen's testimony was unconstitutionally coerced.

*Id.*

### The Federal Habeas Action

This case was filed on May 11, 2004. (Filing no. 1.) The matter was stayed on April 29, 2005, pending resolution of state postconviction proceedings. (Filing no. 34.) On May 6, 2010, the stay was terminated. (Filing no. 44.) Previously, Andre R. Barry and Sean J. Brennan were appointed to represent Lotter in this federal case and they continue to do so now.

I compliment and thank Mr. Barry and Mr. Brennan for their exemplary service to Lotter, the Court and the interests of justice. Accepting an appointment in a death penalty case takes real courage and it is consistent with the highest and best traditions of the bar. These fellows are great lawyers and extraordinary people.

On May 6, 2010, a progression order was entered after consultation with counsel. (*Id.*) A Corrected Second Amended Petition for Writ of Habeas Corpus (filing no. 47 ) was filed, and that petition is the operative pleading in this case. The petition raised 19 claims or grounds for relief. I determined that all 19 claims were potentially cognizable and, after consultation with counsel, an order was entered directing Respondent to file an answer and the state court records. (Filing no. 65.) A briefing schedule was also set. (*Id.*) An answer was filed (filing no. 68) and the voluminous state court record was provided. (Filing nos. 49, 50, 51, 52, 53, 54, 55,

56, 57, 58, 59, 60, 62, and 78.)  The parties submitted their briefs.  (Filing nos. 69, 71, 73, and 76.)

Because the state court record is massive, I directed the parties to prepare a Joint Index.  They complied.  (Filing no. 79.)  This index provides a detailed finding aid for the documents comprising the record.  It includes a specific description of documents comprising the record, a hyperlink to specific documents, and description of the pages comprising each document.  This aid has been very helpful.

I also directed Lotter's counsel to file a Statement of Petitioner Regarding Location in the Record of Presentment and Resolution of Federal Claims in State Court.  Counsel complied helpfully providing a description of each claim, where that claim was allegedly presented, where that claim was resolved and hyperlinks to make access to the specific documents much easier.  (Filing no. 80.)  Like the Joint Index, this additional finding aid has been of great assistance.

In addition, the parties submitted a joint stipulation regarding a portion of a transcript of the sentencing hearing regarding Nissen.  (Filing no. 78.)   Although there is no dispute about the transcript itself, there is a dispute about whether it actually became a part of the record before the Nebraska Supreme Court in Lotter's direct appeal.  Petitioner asked the Nebraska Supreme Court to judicially notice the transcript, but that court did not explicitly rule upon the request.  Relying upon a portion of the Nebraska Supreme Court's opinion on direct appeal, *see Lotter*, 586 N.W.2d at 611 ("In the instant case, the trial court did indeed participate in the negotiations at issue."), Lotter asserts that the court must have relied upon this transcript.  I assume, without deciding, that the Nebraska Supreme Court considered the Nissen transcript.

## II. ANALYSIS

There are three provisions of federal law that are especially important to this case. I discuss those next. After that, I will address each of the claims.

### Procedural Default

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A)   the applicant has exhausted the remedies available in the courts of the State; or

(B)   (i)   there is an absence of available State corrective process; or
      (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A state prisoner must therefore "fairly present" the substance of each federal constitutional claim to the state courts *before* seeking federal habeas relief. *See id.* at 844.

As the United States Court of Appeals for the Eighth Circuit has recently emphasized, the "fair presentment" requirement is strictly enforced:

> Before seeking habeas corpus relief under § 2254, a prisoner ordinarily must "fairly present" his federal claims to the state courts. *See*, *e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 158 L.Ed.2d 64 (2004). This requirement serves the salutary purpose of giving states the "opportunity to pass upon and correct alleged violations of [their] prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (internal quotation marks omitted) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). The onus rests on the prisoner to present the substance of his federal claims "in each appropriate state court (including a state supreme court with powers of discretionary review)." *Baldwin*, 541 U.S. at 29, 124 S. Ct. 1347; *see also Henry*, 513 U.S. at 365-66, 115 S. Ct. 887 ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."). It is not enough to recite "only . . . the facts necessary to state a claim for relief," *Gray v. Netherland*, 518 U.S. 152, 163, 116 S. Ct. 2074, 135 L.Ed.2d 457 (1996) (citing *Picard*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438), or to "make a general appeal to a constitutional guarantee as broad as due process," *id.* (citing *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (per curiam)). Likewise, "[m]ere similarity between . . . state law claims and . . . federal habeas claims is insufficient" to satisfy the fair presentation requirement. *Carney v. Fabian*, 487 F.3d 1094, 1097 (8th Cir.2007) (alteration in original) (quoting *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir.1997)). Thus, we have held that "[i]n order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Id.* at 1096 (internal quotation marks omitted) (quoting *McCall*, 114 F.3d at 757). If a prisoner fails to present his federal claims to the state courts, those claims are generally considered procedurally

defaulted. *See*, *e.g.*, *Barrett v. Acevedo*, 169 F.3d 1155, 1161 (8th Cir.1999) (en banc) (citing *Abdullah v. Groose*, 75 F.3d 408, 411 (8th Cir.1996) (en banc)).

*Turnage v. Fabian*, 606 F.3d 933, 936 (8th Cir. 2010) (in a murder case, holding that federal claim that defendant's brother recanted testimony against defendant and that federal due process standards required the state court to hold an evidentiary hearing on the veracity of the recantation was procedurally defaulted where defendant raised only state law grounds in state court for contesting the refusal to hold an evidentiary hearing).

Moreover, where "no state court remedy is available for the unexhausted claim–that is, if resort to the state courts would be futile–then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default' (or actual innocence . . .)." *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)). Stated another way, if a claim has not been presented to the Nebraska appellate courts and is now barred from presentation, the claim is procedurally defaulted, not unexhausted. *See Akins v. Kenney*, 410 F.3d 451, 455-456 n. 1 (8th Cir. 2005).

The Nebraska Supreme Court has stated that the need for finality in the criminal process requires that a defendant bring all claims for relief on direct appeal if those claims are then known, and the failure to do so will result in forfeiture of such claims. *See*, *e.g.*, *State v. Hall*, 646 N.W.2d 572, 579 (Neb. 2002). In the same vein, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief

cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall*, 646 N.W.2d at 579.

In such circumstances, where a Nebraska court rejects a claim on state procedural grounds, and "issues a 'plain statement' that it is rejecting petitioner's federal claim on state procedural grounds," a federal habeas court is precluded from "reaching the merits of the claim." *Shaddy v. Clarke*, 890 F.2d 1016, 1018 (8th Cir. 1989); *see also Greer v. Minnesota*, 493 F.3d 952, 957 (8th Cir. 2007) (reiterating that "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement," federal habeas is barred because "[i]n such instances, the state prisoner forfeits his right to present his federal claim through a federal habeas corpus petition") (quotations omitted). However, the state court procedural decision must "rest[] on independent and adequate state procedural grounds." *Barnett v. Roper*, 541 F.3d 804, 808 (8th Cir. 2008) (quotation omitted). "A state procedural rule is adequate only if it is a firmly established and regularly followed state practice." *Id.* (quotation omitted).

Even where a claim has been procedurally defaulted, a petitioner is entitled to an opportunity to excuse the default. *See Akins*, 410 F.3d at 455-456 n.1. To excuse a procedural default, a petitioner must demonstrate either cause for the default and actual prejudice as a result of the alleged violation of federal law, or, in rare cases, that the failure to consider the claim will result in a fundamental miscarriage of justice (such as where the petitioner is "actually innocent"). *Coleman v. Thompson*, 501 U.S. 722, 749-750 (1991).

Although there is no precise definition of what constitutes cause and prejudice, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 283 n. 24 (1999) (quotation omitted). Additionally, the Eighth Circuit has

held that ineffective assistance of counsel at the state postconviction stage is not sufficient to constitute "cause" to excuse the procedural default of a habeas claim. *See Armstrong*, 418 F.3d at 927.

## *AEDPA Deference*

The Antiterrorism and Effective Death Penalty Act of 1996, Pub L. No. 104-132, 110 Stat. 1214, (known as "AEDPA"), is an Act of Congress signed into law on April 24, 1996. According to that law, when a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the facts and the law. *See* 28 U.S.C. § 2254(d).

With regard to the deference owed to factual findings of a state court's decision, a federal court is bound by those findings unless the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Further, section 2254(d)(1) states that a federal court may not grant a writ of habeas corpus unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *See id.* at 405-06.

Further, "it is not enough for [the federal court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006). "An incorrect decision is not necessarily unreasonable, and we may not grant a writ of habeas corpus unless the state court decision is both wrong and unreasonable." *Palmer v. Clarke*, 408 F.3d 423, 429 (8th Cir.2005).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). The deference due to state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.* In short, "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

This high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460-61 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance–combined with its express

determination that the ineffective-assistance claim as a whole lacked merit–plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (quotations and citations omitted).

The court also determined that a federal district court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id. at 497*. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.* The Supreme Court agrees, recently stating:

> There is no text in the statute requiring a statement of reasons. The statute refers only to a "decision," which resulted from an "adjudication." As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.

*Harrington*, 131 S. Ct. at 784.

*Strickland Standard*

Claims of ineffective assistance of counsel are reviewed under the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner. *Id.* at 687; *see also Bryson v. United States*, 268 F.3d 560, 561 (8th Cir. 2001); *Williamson v. Jones*, 936 F.2d 1000, 1004 (8th Cir. 1991).

The first prong of the *Strickland* test requires the petitioner to demonstrate that his attorney failed to provide reasonably effective assistance. *Strickland*, 466 U.S. at 687. In conducting such a review the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. The second prong requires the petitioner to demonstrate "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Hubbeling v. United States*, 288 F.3d 363, 365 (8th Cir. 2002). A court need not address the reasonableness of the attorney's skills and diligence if the movant cannot prove prejudice under the second prong of this test. *See United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996). Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation . . . are virtually unchallengeable" in a later habeas corpus action. 466 U.S. at 690.

Additionally, the Supreme Court has recently emphasized that the deference due the state courts applies with vigor to decisions involving ineffective assistance of counsel claims. *See Knowles v. Mirzayance*, 129 S. Ct. 1411, 1418-20 (2009) (reversing the Ninth Circuit Court of Appeals and holding that the decision of the California Court of Appeals–finding that the defendant was not deprived of effective assistance of counsel when his attorney recommended withdrawing his insanity defense during second phase of trial–was not contrary to or an unreasonable application of clearly established federal law; also concluding, among other things, that there was no reasonable probability that, but for counsel's alleged unprofessional error, the result of the proceeding would have been different).

In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and that "leeway" presents a "substantially higher threshold" for a federal habeas petitioner to overcome. Thus:

The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable–a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See *Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)* ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

*Id*. at 1420 (citation and quotations omitted).

*Ground One: An ex parte communication between the trial judge, the prosecutor, and Petitioner's co-defendant, Marvin Thomas Nissen, violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

Despite Respondent's contrary assertion, this claim was fairly presented to the Nebraska courts, including the Nebraska Supreme Court, and the claim was resolved on the merits. (E.g., filing no. 80 at CM/ECF p. 2; the July 2003 opinion of the Nebraska Supreme Court *Lotter*, 664 N.W.2d at 914-15; and the 1999 modified opinion of the Nebraska Supreme Court regarding the direct appeal, *Lotter,* 587 N.W.2d at 673-75.)

In the modified opinion, the Nebraska Supreme Court resolved this claim by holding that there was no due process violation arising out of the judge's ex parte conference[4] because, after "a comprehensive review of the record[,]" there was "no

_____

[4]In the original opinion on direct appeal, the Nebraska Supreme Court concluded that the conference was "ex parte." *Lotter*, 586 N.W.2d at 609-10. Given that Nissen's case was apparently treated as a separate case pending before Judge Finn, as evidenced by the fact of a separate jury trial with a different court file, and given the fact that the conference included the judge, Nissen's counsel and the

evidence of actual bias on the part of the trial court." *Lotter,* 587 N.W.2d at 675.[5] Lotter concedes that the Nebraska Supreme Court applied the right legal standard (filing no. 71 at CM/ECF p. 41), but he argues that the Nebraska Supreme Court unreasonably found that Judge Finn did not have a personal stake in the outcome. So the argument goes, if Judge Finn had a personal stake in the outcome of the proceeding, he was inherently biased in favor of the prosecution.

Both factually and legally, the Nebraska Supreme Court is entitled to deference on the resolution of this claim because that decision was eminently sensible and is not contrary to federal law. The wry comment by Judge Finn, relied upon by Lotter in his brief, that the agreement between Nissen and the prosecutor should be made public "since it affects my job" (quoted in full in the petitioner's brief, filing no. 71 at CM/ECF p. 42), evidences nothing more than a bit of gentle irony, the judge's desire for transparency and absolutely nothing about bias toward Lotter or in favor of the prosecutor. After all, the statement was made in the presence of counsel for Lotter and, at least partly, was made in an effort to make sure Lotter's counsel was able to obtain a copy of the agreement. Simply put, the only attempted showing of an alleged lack of impartiality on the part of Judge Finn is the aforementioned quoted language. That is not nearly enough to overcome the required deferential review of the Nebraska Supreme Court's decision. When that deferential standard of review is applied, the Nebraska Supreme Court's decision cannot be overturned by a federal court. Still further, my independent review of the record compels me to also conclude that Judge Finn had no actual bias against Lotter or in favor of the prosecution.

---

prosecutor, I am not at all certain that the Nebraska Supreme Court was correct *as a matter of federal law* in describing the conference as "ex parte." But, for the purposes of this opinion, and since the parties do not contend otherwise, I proceed on the assumption that the conference was "ex parte."

[5]Of course, this also meant that trial counsel could not have been ineffective for failing to move to recuse the judge as there was no prejudice.

*Ground Two: The prosecution's use of Nissen's perjured testimony to obtain Petitioner's conviction and sentence of death, and the state's failure to correct that conviction and sentence, violate Petitioner's rights under the Fifth, Eighth, and Fourteenth Amendments to the Constitution.*

Initially, to the extent that this claim is predicated upon the assertion that the prosecutors *knew or should have known* that Nissen perjured himself at or near the time that Nissen testified, the Nebraska Supreme Court held in 2009 that such a claim was procedurally barred because it could have been asserted during the direct appeal or in the several postconvictions which predated the 2008 postconviction action in which the claim was presented. That is:

> [T]he recently discovered recantation by Nissen is in no way probative of whether the State knew or should have known Nissen's testimony was perjured at the time of Lotter's trial or whether it failed to disclose exculpatory evidence with regard to Nissen's testimony. In fact, Lotter's allegation that the State knew or should have known of Nissen's perjury at the time of trial stems not from the recantation affidavit, but from information known to the State that Nissen had lied several times in the past and had refused the State's request that he take a lie detector test before testifying.
>
> The problem is that Lotter fails to allege that this evidence was unavailable before any of the numerous challenges already made to his convictions and sentences. None of the facts alleged in the current motion could prove the State knowingly used perjured testimony against Lotter. And, even assuming that a due process claim can rest on the State's negligent failure to know that testimony is perjured, Lotter is procedurally barred from raising his current allegations.

*Lotter,* 771 N.W.2d at 561 (footnote omitted).

I find nothing to refute the foregoing analysis. Accordingly, I find and conclude that Lotter has procedurally defaulted the claim that the prosecutors knew

or should have known that Nissen perjured himself at or about the time Nissen testified.

I also find and conclude that Lotter has not excused the procedural default. In particular, he has shown neither "cause" nor "prejudice" and he has certainly not shown that he is actually innocent even if one assumes that Nissen did in fact perjure himself as to who shot the victims. Importantly, Nissen did not recant all of his testimony. Even though Nissen recanted the assertion that Lotter shot the victims, Nissen did not recant the other portions of his testimony which directly inculpated Lotter (such as by participating in the planning, acquiring the murder weapons, traveling with Nissen to the scene of the murders, and participating in the creation of alibis) in the three murders and made Lotter jointly responsible.

As the Nebraska Supreme stated regarding the issue of actual innocence,

Nothing in the allegations presented by the postconviction motion, even if true, refutes the evidence at trial that Nissen and Lotter, wearing gloves, traveled to Lambert's house in order to kill Brandon and anyone else they found there. The recantation does not refute the evidence that Lotter stole the gun used to murder the victims and that Lotter obtained the knife and the gloves worn during the crimes. It does not refute the testimony of a witness that on the evening of the murders, Lotter told the witness he desired to kill someone and that after the murders, Lotter sought to obtain an alibi. As we indicated in Lotter's appeal from the denial of his motion for DNA testing, because of the joint participation in the felony and the reckless indifference to human life, it is irrelevant to the degree of culpability by whose hand the victims actually died. And certainly, determination of this question does not make a showing of actual innocence of the crimes for which Lotter was convicted and sentenced. As such, postconviction relief based upon Nissen's recent recantation was properly denied without an evidentiary hearing.

*Id.* at 564 (footnote omitted).

Next, I turn to the question of perjury per se recognizing that there is no basis for concluding the prosecutor used Nissen's testimony knowing that it was a lie. The Nebraska Supreme Court stated that the United States Supreme Court "while holding that affirmative prosecutorial involvement in perjured testimony may interfere with the fairness of the trial process, has never held that the prosecution's unknowing reliance at trial on perjured testimony violates any constitutional right." *Id.* at 562 (footnotes omitted). The Nebraska Supreme Court refused to follow the Second Circuit's decision in *Ortega v. Duncan*, 333 F.3d 102, 108 (2nd Cir. 2003) (when false testimony is provided by a government witness *without the prosecution's knowledge*, due process is nevertheless violated if the testimony was material and the reviewing court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted). *Id. at 562-63*

Rather, the Nebraska Supreme Court ruled that the "majority of the federal circuits reject the Second Circuit's conclusion that affirmative prosecutorial involvement is not a necessary element of a due process violation based on perjured testimony." *Id.* at 562-63 & n. 47 (citing *Luna v. Beto*, 395 F.2d 35 (5th Cir. 1968); *Smith v. Gibson*, 197 F.3d 454 (10th Cir.1999); *Reddick v. Haws*, 120 F.3d 714 (7th Cir.1997); *Jacobs v. Singletary*, 952 F.2d 1282 (11th Cir.1992); *Smith v. Black,* 904 F.2d 950 (5th Cir.1990), *abrogated on other grounds, Stringer v. Black,* 503 U.S. 222 (1992); *Stockton v. Com. of Va.*, 852 F.2d 740 (4th Cir.1988); *Burks v. Egeler*, 512 F.2d 221 (6th Cir. 1975); *White v. Hancock*, 355 F.2d 262 (1st Cir.1966); *United States v. Maroney,* 271 F.2d 329 (3d Cir.1959); *Pina v. Cambra*, 171 Fed.Appx. 674 (9th Cir.2006); *Billman v. Warden*, 79 A.2d 540 (Md. 1951)). Accordingly, the Nebraska Supreme Court decided that: "We do not grant postconviction relief in the absence of a constitutional violation, and the presence of perjury by a key witness does not, in and of itself, present a constitutional violation." *Id.* at 563.

Under AEDPA, what should I make of the Nebraska Supreme Court's decision? To start with, the Eighth Circuit likely follows the rule described by the Nebraska Supreme Court. *See Johnson v. Bennett*, 386 F.2d 677, 680 (8th Cir.1967) ("So far as we have been able to ascertain, all the Supreme Court cases setting aside convictions for want of due process by reason of the reception of false testimony are based upon the knowledge of the prosecutor that the testimony received is false or knowledge that material evidence has been suppressed. Such would appear to be a proper limitation of the rule. If convictions could be set aside years after they became final merely upon proof that some testimony of a witness proved to be false, there would be no finality to convictions and the orderly administration of justice would be unduly hampered."), *vacated on other grounds*, 393 U.S. 253 (1968).

But, Lotter argues that *Lewis v. Erickson*, 946 F.2d 1361, 1362 (8th Cir. 1991) (rape victim's recantation of her identification testimony entitled petitioner to habeas relief) requires issuance of the writ or an evidentiary hearing. Lotter is mistaken.

First, as Chief Judge Friedman has observed, "the [Eighth Circuit] granted habeas relief [in *Lewis v. Erickson*] on the basis of perjured testimony without discussing the prosecutor's role in presenting the perjury." *Mooney v. Trombley*, No. 050CV-71329-DT, 2007 WL 2331881 at *14 n.2 (E.D. Mich. Aug. 13, 2007). Thus, *Lewis v. Erickson* does not even address the pivotal question. Second, *Lewis v. Erickson* was decided prior to the enactment of AEDPA's deferential standard of review. Read as Lotter would read *Lewis v. Erickson*, the AEDPA deferential standard of review becomes meaningless. Such a reading is improper and unjustified.

Most importantly, these decisions themselves are irrelevant because Lotter is entitled to habeas relief only if he can show an unreasonable application of "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). In this regard, "[t]he Supreme Court has never held that due process is offended by a conviction resting on perjured testimony where the prosecution did not

know of the testimony's falsity at trial." *LaMothe v. Cademartori*, No. C 04-3395, 2005 WL 3095884, at *5 (N.D.Cal. Nov. 11, 2005) (citing *Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of certiorari) (noting that the Supreme Court has yet to consider the question of whether due process is violated by a conviction based on perjured testimony regardless of the prosecutor's knowledge)). On the contrary, in *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Court held only that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." The Supreme Court has consistently reiterated this formulation of the due process standard, noting only that due process is violated by the "knowing use of perjured testimony." *United States v. Agurs*, 427 U.S. 97, 103 (1976). *See also Schaff v. Snyder*, 190 F.3d 513, 530 (7th Cir.1999) (rejecting Second Circuit's view as inapposite under AEDPA because the Supreme Court has never extended *Napue* to situations involving perjury about which a prosecutor had no knowledge).

Therefore, and regardless of the correctness of Nebraska's decision with respect to the newly discovered evidence of Nissen's partial recantation, Lotter has failed to establish that the resolution of this issue was contrary to, or an unreasonable application of, clearly established Federal law as determined by the Supreme Court. Accordingly, Lotter is not entitled to habeas relief on this claim.

*Ground Three: The trial court's denial of Petitioner's motion to continue violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

Initially, I agree with Lotter that claim three was fairly presented to the Nebraska Supreme Court, but I disagree with him that AEDPA deference does not apply because the Nebraska Supreme Court ruled that the denial of the motion for continuance did not amount to an abuse of discretion. *Lotter*, 586 N.W.2d at 622 (holding that denial of motions for continuance was not an abuse of discretion). A

ruling can be on the merits of a federal claim for AEDPA purposes without a reference to federal law or Supreme Court precedent. *See*, *e.g.*, *Storey v. Roper*, 603 F.3d 507, 515 (8th Cir. 2010) (holding that Missouri Supreme Court's ruling regarding late disclosure of witnesses was subject to AEDPA deference even though the "Missouri court did not mention federal law or Supreme Court precedent" and deciding that habeas relief was not warranted in a death penalty case due to prosecutor's late disclosure of victim character witnesses) (citing *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003)), *cert. denied*, ___ S.Ct. ___, 2011 WL 677093, 79 U.S.L.W. 3492 (Feb. 28, 2011). Here it is apparent that the "abuse of discretion" ruling was shorthand for "there was no violation of defendant's rights, constitutional or otherwise."[6] When AEDPA deference is applied to this claim, that decision clearly meets federal constitutional standards.

But even if de novo review is required, that type of review does not help Lotter. Two Supreme Court precedents principally govern an accused's constitutional right to a continuance. In *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964), a case involving a criminal contempt proceeding against a witness in a criminal trial, the Court opined that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process," indicating that "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." The Court explained that not every denial of a request for more time violates due process, *even if* the consequence of the ruling is that a party fails to offer evidence or is compelled to defend without counsel. On the other hand, the Court allowed that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Id.* In *Ungar*, the Court held that the trial court's denial

---

[6]It would be absurd to hold that a judge does not abuse his discretion by denying a continuance motion and then decide that the judge violates the petitioner's constitutional rights by doing so.

of a motion for continuance on the day of the scheduled contempt hearing did not deprive the defendant of due process, even though counsel said that he was contacted only three days earlier and was unfamiliar with the case. *Id.* at 590-91.

Subsequently, in *Morris v. Slappy*, 461 U.S. 1, 11 (1983), the Court again emphasized that "[t]rial judges necessarily require a great deal of latitude in scheduling trials," and explained that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." The governing standard for the Sixth Amendment, the Court declared, is that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* at 11-12 (quoting *Ungar*, 376 U.S. at 589).

The continuance motion at issue related to the late revelation that Nissen would testify for the government. The prosecutor stated that Nissen's willingness to testify had been expressed only very recently and the prosecutor did not like the situation any better than defense counsel or the court. There is not the slightest reason to believe that the prosecutor was lying. The trial judge considered the fact that the jury was waiting, and ruled that the continuance motion would be denied and the opening statements would proceed but Lotter's trial counsel "gets the opportunity to depose [Nissen] if he wants to." (Filing no. 57-12 at CM/ECF p. 13.)

Judge Finn's decision represents the quintessential balancing of interests that trial judges are compelled to make all the time while under intense pressure to expeditiously but fairly adjudicate criminal cases. Such a decision was certainly not arbitrary or unreasonable. *See, e.g.*, *Storey*, 603 F.3d at 514-516 (prosecution's introduction of victim character witnesses, not disclosed until the first day of a penalty-phase capital murder trial, did not warrant federal habeas relief where, among

other things, counsel had opportunity to interview the witnesses before their testimony).

Moreover, a review of the record reveals no prejudice. For example, although Lotter bemoans the fact that his lawyer did not tailor his opening statements to meet the testimony of Nissen, a review of the opening statements of both sides indicates that neither one mentioned that Nissen might testify. (Filing no. 57-12 at CM/ECF pp. 25-43.) With the deposition of Nissen authorized for that evening, it is apparent that neither side thought it advisable to address Nissen's testimony. That is, neither lawyer was willing to gamble about what Nissen would say without the deposition being completed. In short, if Lotter's counsel was constrained to give a more general opening statement, it also true that the prosecutor was too. More fundamentally, and after a careful review of the record, neither side was prejudiced by being required to make their opening statements before the deposition of Nissen had been completed.

Lotter argues that his counsel challenged the prosecutor to "put the gun in Lotter's hands" during the opening statement and he asserts that his lawyer would not have made that statement had a continuance been granted. As a tactical matter, I do not understand why that would be so. But even if that were true, it is impossible to believe that Lotter was prejudiced given the generic nature of the prosecutor's opening statement that, of course, preceded the opening of the defense.

In addition, a review of the cross examination of Nissen indicates that trial counsel was not impeded from vigorously attacking Nissen as a liar and a convicted murder who had a deal with the government to avoid the death penalty. While other portions of the cross examination could be cited, the following is illustrative:

Q.     You've got it all figured out, don't you Mr. Nissen? I mean, you've got the reports; your story has changed a little bit here, a

little bit there.  When the police find something out you just change the story.  Isn't that right?

A.    My testimony now is the truth.

Q.    That's not what I'm asking you.  I'm asking you since your arrest in this matter, every time you give a statement you give a little bit more, but it's only because the police have found out about it, right?

A.    No, I don't believe so.  Or maybe I don't understand exactly what you're tryin' to say.

Q.    What I'm saying, Mr. Nissen, is the first time you gave a statement to the police, you didn't tell them the truth, did you?

A.    Some of the things were not the truth.

Q.    They were lies, right?

A.    Some of the things were lies, yes.

Q.    And the second statement, you told them a little bit more because they found out about the knife.  Deputy Larson had asked you about the knife so you told them a little bit more at that time.  But you still didn't tell them the truth, right?

A.    Not the complete truth, no.

Q.    Then you told various people, you told Olberding a little bit; you told Larson a little bit; Foote, Murphy, Schott.  Right?

A.    Well, except for Schott.  I never discussed anything with Schott except for things he could have read out of the newspaper.

Q.    Could he have read that you shot Phillip DeVine out of the newspaper?

A.      I don't believe so.

Q.      So, on each occasion that you met with the police officer to discuss the case, your story changes a little bit.

A.      Yes.  I would have to say yes, it has.

Q.      And as you talked to the police officers and tell them one new story after another, what happens is that – that Mr. Lotter's involvement goes down and yours keeps goin' up.  Right?  We've got the knife and we've got planning and we've got hatchets and ropes and all the rest of this stuff, and you look more and more guilty.  Right?

A.      Yes, Somewhat, yes.

Q.      But you're still not as guilty as Mr. Lotter, right?  That's what you're tellin' us today.

A.      I'm just as guilty as Mr. Lotter is concerning those three deaths.

Q.      Well, didn't you tell me last night that – that you're guilty or responsible but he's more responsible, that's why it's okay for you to take this deal?

A.      In terms of I didn't kill anyone.

Q.      I see.  Just like your first statement and the second statement that you didn't use the knife.

A.      No.  Because unlike those two statements, this statement is the truth.

Q.      I see.  Isn't this pretty consistent, Mr. Nissen, with how you've acted time and time again in the killing of Teena Brandon, the rape of Teena Brandon, the statements to Investigator Hayes,

whatever it takes. Whatever you have to do; lie, kill, whatever, you will do if you can get out of what you're in. Right?

A.    Except for now when I'm tellin' the truth.

Q.    Except for now.

A.    When I'm tellin' the truth.

Q.    *And isn't it amazing that now, when you're telling us the truth, the truth is told so that you won't be put to death; so that you won't be executed?*

A.    *I don't know; that part of the agreement is that the State won't present aggravating factors. But how do I know that they could have done it anyway? So I have no way to know.*

Q.    *Oh, so you're really not getting anything, right?*

A.    *Well, yes. I'm not – There won't be a death sentence hearing.*

Q.    *You're not going to be put to death, are you, Mr. Nissen?*

A.    *No.*

Q.    *Given what you've told us, that possibility still exists for Mr. Lotter.*

A.    *Yes.*

Q.    *But you're willing to trade your life for his.*

A.    *I'm only telling the truth.*

Q.    *Just like you told Investigator Hayes the truth when you blamed him of sexual assault and you're the one that actually did it.*

A.     Except for now I'm tellin' the truth.

Q.     Is there anybody you won't sacrifice, Mr. Nissen?

A.     Sacrifice to what?  What are you referring to?

Q.     I can't imagine.

       No further questions, Your Honor.

(Filing no. 57-14 at CM/ECF pp. 167-171.)  (Emphasis added).

A review of counsel's closing arguments reveals the same thing.  (Filing no. 57-17 at CM/ECF pp.  153-193.)   Counsel ably argued that Nissen was a liar and possessed a strong motive to falsely implicate Lotter to avoid the death penalty.

Also, the trial judge made sure that trial counsel had the transcript of Nissen's deposition[7] *before* cross examination was required.  *Lotter*, 586 N.W.2d at 605.  Still further, the trial judge made sure that defense counsel had a copy of Nissen's agreement, albeit after Nissen testified for the government, but before the case ended. *Id.*

To the degree that Lotter argues that his trial counsel did not obtain a copy of Nissen's specific written plea agreement until after Nissen testified and his counsel was hampered thereby, that argument finds no support in the record.  Nissen could have been called in Lotter's case in chief and grilled about the specifics of the written agreement.  Given the earlier compelling cross examination of Nissen about the essence of the agreement–that is, Nissen's life would be spared in exchange for his testimony thus "sacrificing" Lotter for Nissen–it was not critical to cross examine Nissen about the specific wording of the agreement.  Still further, Lotter called

_____

[7]The deposition may be found at filing no. 59-7 at CM/ECF pp. 30-135.

Investigator Roger Chrans to testify. (Filing no. 57-16 at CM/ECF p. 32.) Among other things, trial counsel examined the investigator about the meaning of words in the agreement. (E.g., filing no. 57-16 at CM/ECF p. 98.)

In summary, the Nebraska Supreme Court's decision is entitled to deference since it was not inconsistent with federal law. Even if reviewed on the merits, there was no federal constitutional violation arising out of the denial of the continuance motion. Specifically, there is no showing that the defense was impaired by the denial of the continuance.

*Ground Four: The prosecutor's misconduct in failing to disclose the existence of an agreement between the State and Nissen until the end of the second day of Petitioner's trial violated Petitioner's rights under Fifth, Sixth, Eight, and Fourteenth Amendments to the Constitution.*

Lotter argues that the Nebraska Supreme Court misapplied *DeMarco v. United States*, 415 U.S. 449 (1974) (holding that where there is a question of whether a government witness, contrary to his testimony at defendant's trial, had entered into plea bargain prior to his testimony, that issue should have been remanded for initial disposition by the district court after an evidentiary hearing, and should not have been resolved as a matter of fact by the Court of Appeals based on the materials before it).[8]

Specifically, Lotter argues that, when the prosecutor told the trial judge and Lotter's trial counsel that the agreement had not yet been finalized, the prosecutor was lying as there was strong reason to believe that the agreement had in fact been finalized when the prosecutor spoke. Lotter points out that the Nebraska Supreme

---

[8]*DeMarco* is a very short per curiam opinion, it contains little reasoning, and, according to Justice Rehnquist, it was the product of the Solicitor General's "backhanded invitation" for a remand. 415 U.S. at 450. Thus, the precedential value of *DeMarco* is limited.

Court stated: "The facts indicate and it is reasonable to conclude that the sentencing agreement was signed early Monday morning. Because the prosecutor stated that the agreement was not finalized at that time, there is a genuine factual issue as to when the agreement was actually 'finalized.'" *Lotter*, 586 N.W.2d at 616. Thus, Lotter argues that *DeMarco* requires that his conviction be vacated or an evidentiary hearing ordered. Since the Nebraska Supreme Court found that the instant case is "unlike *DeMarco v. United States* . . ." and refused to apply it, *id.*, Lotter argues that the Nebraska Supreme Court erred in its application of federal law. Lotter is wrong.

The Nebraska Supreme Court was correct, *DeMarco* does not apply. Here, Nissen admitted that he had an agreement with the government and he was cross-examined about it. In *DeMarco*, the cooperating witness denied any such arrangement. Since Nissen admitted that he had an agreement with the government when he was cross examined, *DeMarco* does not apply and there was nothing unreasonable about the Nebraska Supreme Court's ruling that if Lotter wanted to know precisely when the agreement had been finalized, he could have pursued that matter at the time of trial. Accordingly, this claim is denied.

*Ground Five: The prosecutor's misconduct in failing to produce the actual agreement with Nissen until after Nissen had testified violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

This claim is similar to claim three and claim four. In short, there was no federal constitutional violation by virtue of the production of the specific plea agreement after Lotter testified but before the trial ended. Lotter was examined by defense counsel about the gist of the agreement. In addition, Lotter could have called Nissen in his case in chief to ask him about the specific agreement and Lotter did call the chief investigator in his case in chief and examined him about the agreement.

To the extent Lotter claims that there was an "oral agreement" between Nissen and the prosecutor about a polygraph that was not disclosed (filing no. 71 at CM/ECF pp. 57, 59-60), that portion of this claim is procedurally defaulted as it has not been presented to the Nebraska courts and it is too late to do so now. That default has not been excused.

In any event, there was no "oral agreement" about a polygraph. During the negotiations, the prosecutor proposed that Nissen take a polygraph as part of the agreement, but counsel for Nissen, Peter Blakeslee, refused to accept such a condition. (Filing no. 59-4 at CM/ECF p. 35.) Since there was no "oral agreement" on a polygraph, there was nothing for the government to disclose.

Besides, as a matter of federal law, defense evidence regarding the government's decision not to polygraph a witness is "'wholly irrelevant, potentially confusing and unfairly prejudicial.'" *See*, *e.g.*, *United States v. Zaccaria*, 240 F.3d 75, 80-81 (1st Cir. 2001) (affirming trial court's decision in refusing to allow defendant to cross-examine agent concerning failure to administer polygraph tests to potential witnesses). Claim five is denied.

*Ground Six: The prosecutor's misconduct in knowingly using Nissen's perjured testimony to obtain Petitioner's conviction violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

Lotter's claim six is nearly identical to claim two regarding "knowing" use of perjured testimony. As indicated in the discussion of claim two, in 2009, after several prior postconviction actions, the Nebraska Supreme Court found that claim had been procedurally defaulted, there is nothing to refute that analysis, and the default has not been excused. On those same grounds, claim six is denied.

*Ground Seven: The prosecutor's misconduct in failing to disclose exculpatory evidence that could have been used to impeach Nissen violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.*

This ground is essentially a *Brady v. Maryland*[9] and *Giglio v. United States*[10] claim. Lotter claims that the prosecution failed to disclose things like the assertion of Nissen's stepmother that Nissen was "con artist" and a "world-class liar" and documentation of Nissen's false accusation against a Clyde Burns that Burns assaulted Nissen and Nissen's subsequent recantation of that accusation after failing a polygraph. (Filing no. 71 at CM/ECF p. 31 (Lotter's brief in this case).)

This claim was never fairly presented to the Nebraska Supreme Court or otherwise. Indeed, during the postconviction evidentiary hearing, and the cross examination of the trial prosecutor, postconviction counsel (Mr. Soucie) told the judge that he was not asserting "a direct Brady problem" and "I'm not talking about Brady." (Filing no. 59-4 at CM/ECF p. 41.)

Lotter's brief addresses "fair presentment," but admits that Lotter did "not explicitly present[] [this claim] to the state court under the "Brady" label. . . ." (Filing no. 71 at CM/ECF p. 63.) Lotter's "fair presentment" argument is based upon a stringing together of unrelated statements from the state court brief in the 1999 postconviction appeal. (Id. at CM/ECF pp. 64-65, citing filing no. 50-6 at CM/ECF pp. 39-41, 51-52.) The state courts were never alerted to this federal claim. Indeed, that is obviously why there is no discussion of this claim by the state courts. Because this claim was not fairly presented to the state courts and because it cannot now be presented to the Nebraska courts given the previous state postconviction actions that have already taken place and Nebraska's rule against serial postconviction actions,

---

[9] *Brady v. Maryland*, 373 U.S. 83 (1963).

[10] *Giglio v. United States*, 405 U.S. 150 (1972).

the claim has been exhausted but it is procedurally defaulted. Lotter has not excused the default. Claim seven is denied.

*Ground Eight: The prosecutor's misconduct during his closing argument violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

During closing argument, the prosecutor referred to the O.J. Simpson case and described Lotter as "evil." As a result, a constitutional violation of Lotter's rights is asserted. Claim eight will be denied.

The prosecutor spoke briefly regarding a "red herring" and "cops" not "do[ing] their job" that "[y]ou hear . . . all the time with the O.J. thing." (Filing no. 57-17 at CM/ECF p. 178.) While the "evil" reference was fairly presented, the "O.J. case" reference was not. Therefore, the "O.J."portion of the claim has been defaulted and it has not been excused.

The Nebraska Supreme Court addressed the "evil" comment, but concluded:

> Defense counsel did not make any objections during the prosecution's closing argument. When a party has knowledge during trial of irregularity or misconduct, he must timely assert his right to a mistrial. One may not waive error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *See*, *e.g.*, *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994) (holding that defendant waived objection to prosecutor's improper comments during closing argument).

*Lotter,* 586 N.W.2d at 621.

The failure to object as required by a contemporaneous-objection rule is often treated as a procedural bar under state law and may result in a procedural default

-53-

under federal law–that is the case here.  *See, e.g.,* *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009) (trial counsel's failure to object to prosecutor's closing or rebuttal in criminal sexual conduct prosecution based on defendant's alleged sexual abuse of his daughter, which questioned defendant's motives for remaining silent during state probate court hearing at which daughter was placed in foster care, resulted in procedural default of Fifth Amendment claim in subsequent habeas proceeding). Lotter has not excused the default.

Even if one got to the merits, however, Lotter's argument is unavailing.  The "evil" remark, while probably improper, was only a small part of the prosecutor's lengthy closing argument.  (E.g., filing no. 57-17 at CM/ECF p. 188.)  No discernible prejudice resulted.  Claim eight is denied.

*Ground Nine: The cumulative effect of the prosecutor's misconduct, as outlined in Grounds One through Eight, above, violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.*

To the extent portions of claim 1-8 have been procedurally defaulted, this claim is defaulted as well.  To the same extent, those defaults have not been excused.

Moreover, the Nebraska Supreme Court considered a "cumulative misconduct" claim on direct appeal and denied that claim because it "is without merit."  *Lotter*, 586 N.W.2d at 622.  To that extent, claim nine requires that I apply AEDPA deference to the Nebraska Supreme Court's ruling.  After doing so, I find and conclude that this claim must be denied because the Nebraska Supreme Court's decision was not unreasonable.

*Ground Ten: As demonstrated by the exculpatory evidence which the prosecution failed to produce before the end of Petitioner's trial, other exculpatory evidence that was not in the prosecution's possession at the time of Petitioner's trial, the fact that Nissen has now recanted his trial testimony, and DNA evidence that may corroborate*

*Nissen's recantation, Petitioner is actually innocent of the charges against him and the sentence of death that has been imposed, and Petitioner's conviction and sentence violate the Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

Lotter's "actual innocence claim" was denied in the 2009 decision of the Nebraska Supreme Court. The Nebraska Supreme Court decided that even assuming Nissen's recantation was truthful regarding who actually shot the victims, the remaining evidence, including the portions of Nissen's testimony that he did not recant, established that Lotter was not actually innocent. That is:

> Nothing in the allegations presented by the postconviction motion, even if true, refutes the evidence at trial that Nissen and Lotter, wearing gloves, traveled to Lambert's house in order to kill Brandon and anyone else they found there. The recantation does not refute the evidence that Lotter stole the gun used to murder the victims and that Lotter obtained the knife and the gloves worn during the crimes. It does not refute the testimony of a witness that on the evening of the murders, Lotter told the witness he desired to kill someone and that after the murders, Lotter sought to obtain an alibi. As we indicated in Lotter's appeal from the denial of his motion for DNA testing, because of the joint participation in the felony and the reckless indifference to human life, it is irrelevant to the degree of culpability by whose hand the victims actually died. And certainly, determination of this question does not make a showing of actual innocence of the crimes for which Lotter was convicted and sentenced. As such, postconviction relief based upon Nissen's recent recantation was properly denied without an evidentiary hearing.

*Lotter*, 771 N.W.2d at 564 (footnote omitted).

Whether Lotter's claim of "actual innocence" is judged by *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (an "enormous burden" that is "extraordinarily high") or *Schlup v. Delo*, 513 U.S. 298, 329 (1995) ("a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence,

no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt") or otherwise, the result is the same.    Lotter loses.

Initially, the Nebraska Supreme Court's resolution of this ground for relief is entitled to AEDPA deference.  That ruling is certainly not unreasonable.  Furthermore, if I were to decide the question independently, I would come to the same conclusion as the unanimous Nebraska Supreme Court and that is true whether I judged the claim under *Herrera* or *Schlup* or otherwise.

*Ground Eleven: The trial court's instructions on the charges of first-degree murder, which did not require the jury to reach a unanimous agreement as to whether Petitioner committed premeditated murder or felony murder, violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

Initially, this claim has been defaulted.  On direct appeal, Lotter never attacked the jury instructions for failing to require unanimity.   (E.g., filing no. 49-17 at CM/ECF pp.  125-126.)   As a result, there has been a procedural default of this claim, and that default has not been excused.

Moreover, the Supreme Court has upheld a first degree murder conviction, as against a due process challenge, under instructions that did not require the jury to agree on one of the alternative theories of premeditated and felony-murder.  *Schad v. Arizona*, 501 U.S. 624 (1991).  *Cf. Cross v. Bruton*, 249 F.3d 752, 754 (8th Cir. 2001) (following *Schad* and holding that a State court's determination that state's domestic homicide statute did not require that every prior incident that formed "pattern of domestic abuse" be proven beyond reasonable doubt was not contrary to or unreasonable application of clearly established federal law, and thus did not warrant federal habeas relief).

Claim eleven is denied.

*Ground Twelve: Jury instructions advising the jurors that they needed to acquit Petitioner of first-degree murder before they could consider whether Petitioner was guilty of a lesser-included offense violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

Lotter claims that the jury instructions were erroneous because the instructions required the jury to determine the defendant's guilt on murder in the first degree before it could consider the defendant's guilt on the lesser included offense of murder in the second degree. Although Respondent asserts that this claim was procedurally defaulted, I disagree and find and conclude that Lotter fairly presented this claim as a federal claim to the Nebraska Supreme Court. (*See* filing no. 49-17 at CM/ECF pp. 3, 11, and 128-133.)

The Nebraska Supreme Court based its decision on Nebraska law, concluding that: "We have held that 'step' instructions, requiring consideration of the most serious crime charged before consideration of lesser-included offenses, are not erroneous. *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994) [*overruled on other grounds in State v. Burlison*, 583 N.W.2d 31 (Neb. 1998)]. The step instructions in the instant case are likewise not erroneous." *Lotter*, 586 N.W.2d at 626.

A review of the *Jones* case cited by the Nebraska Supreme Court establishes that only state law issues were presented. In sum, the Nebraska Supreme Court did not reach the federal question, and therefore the Nebraska Supreme Court is due no deference on this question.

Turning to the federal question, I conclude that there was no error. The jury was instructed to consider *both* first and second degree murder, but it was also told to consider first degree murder first. (E.g., filing no. 71 at CM/ECF p. 77 (Lotter's brief in this court; consolidating and quoting the challenged instructions).) The basic authority for Lotter's assertion that the instructions violated federal law is *Beck v. Alabama*, 447 U.S. 625 (1980) (sentence of death may not be constitutionally

imposed after jury verdict of guilt of a capital offense where the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense when the evidence would have supported such a verdict).

*Beck* did not condemn jury instructions like this one that allowed the jury to consider both first degree murder and second degree murder (a noncapital offense) but structured the timing of the jury's consideration. *Beck* held only that a jury could not be forced to consider *only* first degree murder when the evidence would allow a conviction on a lesser included noncapital offense. In short, "*Beck* is completely inapposite because it involved an all-or-nothing" choice. *Maples v. Allen*, 586 F.3d 879, 893 (11th Cir. 2009).

Claim twelve is denied.

*Ground Thirteen: The prosecution's use of the threat of death by electrocution, which constitutes cruel and unusual punishment, to procure Nissen's testimony against Petitioner, violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

The Nebraska Supreme Court considered this claim and rejected it. The Nebraska court reasoned:

A witness' testimony is not the result of unconstitutional coercion simply because it is motivated by a legitimate fear of a death sentence. True promises of leniency are not proscribed when made by persons authorized to make them. Thus, it is permissible for the State to make promises of immunity or pardon to witnesses in return for testimonial confessions and to make promises of reduced charges or reduced sentences tendered to defendants and potential defendants by plea bargains in return for judicial admission of guilt. At the time of Nissen's plea agreement with the State, death by electrocution was considered constitutional and the State's promise not to pursue that punishment was thus a legitimate promise of leniency. And, at trial,

Lotter was permitted to thoroughly cross-examine Nissen regarding his motivation to testify against him, including his fear of death by electrocution. We find no merit to Lotter's argument that Nissen's testimony was unconstitutionally coerced.

*Lotter*, 771 N.W.2d at 565 (footnotes omitted).

The Nebraska Supreme Court's resolution of this question was not unreasonable under federal law and it is therefore entitled to deference. With that, claim thirteen is denied.

*Ground Fourteen: The death penalty itself constitutes cruel and unusual punishment, regardless of the method by which it is carried out, and thus Petitioner's sentence of death violates the Eighth and Fourteenth Amendments to the Constitution.*

This question—whether the death penalty violates the Constitution *no matter the method*–was not fairly presented to the state courts (filing no. 49-17 at CM/ECF pp. 151-153), it has been procedurally defaulted and that default has not been excused. Even so, Lotter candidly concedes that there is no Supreme Court precedent to support this claim and further concedes that there is Supreme Court precedent to the contrary. (Filing no. 71 at CM/ECF p. 80 (citing *Gregg v. Georgia*, 428 U.S. 153, 188 (1976)*.*) Accordingly, this ground provides no basis for relief.

*Ground Fifteen: The sentence of death imposed by the three-judge sentencing panel violates the Sixth, Eighth, and Fourteenth Amendments to the Constitution because it was imposed without any specific factual findings by the jury as to any statutory aggravating factors or Petitioner's degree of participation in the charged offenses.*

The Nebraska Supreme Court decided that *Ring v. Arizona*, 536 U.S. 584 (2002) (Arizona statute pursuant to which, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition

of the death penalty, violates the Sixth Amendment right to a jury trial in capital prosecutions) was not retroactive. *Lotter*, 664 N.W.2d at 908. That decision was clearly correct. *See* *Schriro v. Summerlin*, 542 U.S. 348 (2004) (*Ring v. Arizona* was properly classified as procedural rather than substantive, and thus did not apply retroactively to death penalty case already final on direct review). Claim fifteen is denied.

*Ground Sixteen: The three judge sentencing panel's reliance upon an alleged aggravating factor that was unconstitutionally vague and overly broad violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

Lotter attacks the aggravating circumstance found in Neb. Rev. Stat. § 29-2523(1)(b) (Reissue 1995)[11] relating to the allegation that "the murder was committed in an *apparent* effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime." (Emphasis added to highlight claimed ambiguity). The Nebraska Supreme Court seemingly[12] resolved this question on the merits. *Lotter*, 586 N.W.2d at 629 (§10.3.1), 631 (§10.5.2), 634-636 (§13(a)).

---

[11]After sentencing, but before conclusion of the direct appeal on November 6, 1998, the statute was amended to strike the word "apparent," *See* *Nebraska 1998 Session Law Service, 2nd Session of the 95th Legislature 1201*, L.B. 422 (West, April 18, 1998), (available at NE-LEGIS-OLD), but the sentencing panel, of course, used the statute in effect at the time of its sentencing order on February 21, 1996. (Filing no. 49-36 at CM/ECF p. 241.) The Nebraska court thus had to determine whether the amended statute, without the word "apparent," should be applied to Lotter. As noted in the text, the court concluded that the word "apparent" was "redundant" and its omission made no difference. Therefore, a remand was unnecessary.

[12]I use the word "seemingly" because three sections of the Nebraska Supreme Court's opinion must be read together to reach the conclusion that the Nebraska Supreme Court addressed this question on the merits.

The Nebraska Supreme Court wrote that "apparent" meant "readily perceptible" or "'capable of being easily noted' or 'capable of being noted without trouble'" or "obvious." *Id.* at 635.[13]   The Nebraska Supreme Court also concluded that the word "apparent" was "redundant" because the prosecution had the burden of proof beyond a reasonable doubt.

Lotter argues that the Nebraska Supreme Court had no authority to *narrow* this matter on appeal because the language of the statute did not apprise Lotter or the sentencing panel of the meaning of the word "apparent."   Among other things, he misunderstands the ruling.

To the extent that the Nebraska Supreme Court was fairly presented with the argument now before me, and to the extent the Nebraska Supreme Court resolved that question, the Nebraska Supreme Court's decision is entitled to deference as it certainly was not unreasonable.   Essentially, the Supreme Court decided that the word "apparent" needed no narrowing because the meaning was plain.  I agree and I would reach the same conclusion were I to judge the matter independently.

In short, it is clear that Lotter and the sentencing panel had "fair notice" because the meaning of the word "apparent" was plain to a person of ordinary intelligence.  *See, e.g., Palmer v. Clarke*, 408 F3d 423, 440-41 (8th Cir. 2005) (Nebraska Supreme Court's reformulation of the "exceptional depravity" provision

---

[13]This is essentially the same understanding that the sentencing panel had regarding the meaning of the statute.  According to the panel, the purpose of the Brandon murder was "readily discernible" and that was to protect Nissen and Lotter from prosecution regarding the earlier attack on Brandon.  (Filing no. 49-36 at CM/ECF p. 242.) And, there "quite simply" could be "no other motivation" for the Lambert and Devine murders "other than to conceal [Lotter's] identity as perpetrator of the crime of murdering Teena Brandon." (*Id.*)

did not deprive petitioner of fair notice that his infliction of gratuitous violence on a helpless victim would subject him to the death penalty).  Claim sixteen is denied.

*Ground Seventeen: The three-judge panel that sentenced Petitioner to death reviewed the proportionality of his sentence in an arbitrary and unreasonable manner, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

The essence of this claim was presented to the Nebraska Supreme Court, but the Nebraska Supreme Court concluded that:

> In *State v. Moore*, 250 Neb. 805, 553 N.W.2d 120 (1996), this court declined to reevaluate its holding in *State v. Palmer*, 224 Neb. 282, 328, 399 N.W.2d 706, 736 (1986), that comparison reviews "should include only those cases in which the death penalty was imposed." Once again, we decline.  Accordingly, we conclude that Lotter's penalty is proportionate to the penalty imposed in other death penalty cases.

*Lotter*, 586 N.W.2d at 630.

As a matter of federal law, "the Constitution does not require a federal court to reexamine a state court's proportionality finding in order to adjudge 'the manner in which the court conducted its review or whether the court misinterpreted the [state proportionality] statute.'"   *Palmer*, 408 F.3d at 438 (citing, among other cases, *Walton v. Arizona*, 497 U.S. 639, 656 (1990), *overruled in part on other grounds*, *Ring v. Arizona*, 536 U.S. 584, 609 (2002)).  *See also* *Kilgore v. Bowersox*, 124 F.3d 985, 996 (8th Cir. 1997) (state supreme court's review of proportionality of murder defendant's death sentence did not violate defendant's right to due process, despite claim that review was arbitrary and that state did not maintain adequate database of cases, where court conducted comparison of defendant's case with similar cases, and concluded that, against backdrop of other cases, death penalty was not disproportionate to crime of which defendant was convicted).

-62-

Moreover, even a cursory review of the sentencing panel's thoughtful opinion regarding proportionality is enough to conclude that there was nothing arbitrary or unreasonable regarding the imposition of the death penalty on Lotter. (Filing no. 49-36 at CM/ECF pp. 263-271 & 274-275.) Claim seventeen is denied.

*Ground Eighteen: In light of the fact that Nissen was allowed to enter into an agreement taking the death penalty off the table, Petitioner's sentence of death violates the Fifth, Sixth, Eighth, and Fourteenth Amendments' guarantee of proportionality.*

Summarized and condensed, Lotter argues that his death sentence is not proportional because the sentencing panel distinguished Nissen from Lotter on the basis of Nissen's testimony in Lotter's trial and since Nissen's testimony was in part perjured the distinction between Lotter and Nissen vanishes. (Filing no. 71 at CM/ECF p. 85.) Consequently, the Constitution is violated if one assumes that Nissen's recantation is true. The argument continues, I suppose, that without an evidentiary hearing, where Nissen's credibility regarding the recantation can be tested, one cannot assume that Nissen's recantation is false.

Claim eighteen is denied. To begin with, this claim is procedurally defaulted and that default has not been excused. It was never fairly presented to the Nebraska courts and particularly the Nebraska Supreme Court. I have carefully reviewed the citations to the record where Lotter claims it was presented (filing no. 80 at CM/ECF pp. 16-17 (citing portions of the record)), and it is plain to me after reading those citations that claim eighteen was never fairly asserted as a claim or even a stand-alone argument to the Nebraska courts.

Furthermore, and as just noted, the correctness of a state court's proportionality determination is not a matter for federal review. *Palmer, 408 F.3d at 438*. Additionally, the sentencing panel distinguished Nissen from Lotter not only on the basis of his testimony but also on the basis of his prompt confessions to the police

that demonstrated early acceptance of responsibility. (Filing no. 49-36 at CM/ECF p. 271.) The panel stated:

> Within hours of the murders both Defendants were placed under arrest. Nissen gave a statement to Roger Chrans, Criminal Investigator with the Nebraska State Patrol, wherein he implicated both himself and Defendant-Lotter in the three homicides. Nissen told the investigator the motive for the killings, as well as the sequence of events and activities of he and Lotter on the night of the murders. He supplied true information as to where to gun, knife, sheath with name "Lotter" on it, and gloves used in the homicides had been obtained. He further told the investigator the location of these items (gun, knife, sheath, gloves) which were recovered and later used by the State as important physical evidence during the prosecution of both Nissen and Lotter.

(Filing no. 49-36 at CM/ECF p. 269.)

The foregoing facts remain true even if one give credence to Nissen's partial recantation. And, it is this early acceptance of responsibility on Nissen's part, together with the bulk of Nissen's testimony that remains unchallenged, that clearly differentiates him from Lotter and fatally punctures any due process or other federal constitutional claim. Claim eighteen is denied.

*Ground Nineteen: To the extent, if any, that Petitioner's post-conviction counsel failed to raise a claim that the prosecutor's failure to disclose exculpatory evidence violated Petitioner's rights under the Due Process Clauses of the Fifth and Fourteenth Amendments, that failure deprived Petitioner of the right to effective assistance of counsel, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.*

Claim nineteen merits only brief attention. It is sufficient to state that Lotter has no federal right to counsel in a postconviction action, *see, e.g., Coleman v. Thompson*, 501 U.S. 722, 752 (1991) and, even if he did, Lotter has not come close

to establishing that his several postconviction counsel performed deficiently or, if they did, that he was prejudiced thereby. Claim nineteen is denied.

### III. CONCLUSION

The Nebraska courts, and five (or more) zealous defense lawyers, have expended much sweat and treasure insuring that Lotter received a fair trial, a just sentence, a searching appeal and repeated postconviction examinations. A jury of twelve people found beyond a reasonable doubt that Lotter was guilty. A panel of three judges thoughtfully considered whether Lotter should receive the ultimate penalty, and they decided that he should. Seven thoroughly conscientious Justices of the Nebraska Supreme Court scrutinized the conviction and sentence in a direct appeal and they found nothing that justified relief. After that, trial judges and appellate judges patiently examined and denied Lotter's numerous claims asserted in several postconviction actions brought during the ensuing decade.

Following careful consideration of the record developed in the Nebraska courts and despite the superb work of federal postconviction counsel, I find and conclude that Lotter is not entitled to relief. Legally speaking, if Nebraska carries out the sentence, there need be no "second thoughts."

IT IS ORDERED that:

1. The Corrected Second Amended Petition for Writ of Habeas Corpus (filing no. 47) is denied and this case is dismissed with prejudice. A separate judgment will be issued.

2.  Pursuant to Rule 11 of the *Rules Governing Section 2254 Cases in the United States District Courts*, the court denies the issuance of a certificate of appealability as to all claims.[14]

March 18, 2011.                    BY THE COURT:


                                   *Richard G. Kopf*
                                   United States District Judge

---

[14]Rule 11 was modified on December 1, 2009, to provide that a "district court must issue or deny a certificate of appealability *when it enters a final order* adverse to the applicant." (Emphasis added.) A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). Such a showing requires a demonstration "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted), citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4 (1983) (defining pre-AEDPA standard for a certificate of probable cause to appeal).

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.