IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN L. LOTTER, ) | |
| ) | |
| Petitioner, ) | |
| ) | No. 4:04-CV-03187-RGK |
| v. ) | |
| ) | |
| SCOTT FRAKES, Director, ) | |
| Nebraska Department of Correctional ) | |
| Institutions, ) | |
| ) | |
| Respondent. ) | |

**PETITIONER'S INITIAL BRIEF IN REPSONSE TO COURT ORDER**

**NATURE OF THE CASE**

Petitioner John L. Lotter submits this Initial Brief pursuant to the Order of this Court issued May 28, 2015. (Doc. #124.) The Court ordered the parties to file initial briefs addressing the following matters in light of the Nebraska Legislature's repeal of the death penalty, which will become effective "in late August or early September":

> In my opinion, Lotter has exhausted all available federal and state judicial remedies and he cannot now pursue any further federal or state judicial remedies. Therefore, the only justifiable reason for appointing federal counsel in this matter is to allow Lotter to seek clemency. *See* U.S.C. § 3599 (federal counsel may be appointed for "executive or other clemency as may be available to defendant"; for other matters, appointment is only proper for "*available* judicial proceedings" and "*available* post conviction process") (emphasis added). *See also Harbison v. Bell*, 556 U.S. 180 (2009) (federal statute, governing appointment of counsel for an indigent state prisoner seeking federal habeas corpus relief to vacate or set aside a death sentence imposed by a state court, authorizes federally appointed counsel to represent the prisoner in subsequent state clemency proceedings).
>
> On my own, I have come to the conclusion that Lotter's federal counsel should cease all work on this matter until further order of this court, and if the death penalty repeal bill becomes effective, I should then dismiss this matter (and the appointment of federal counsel) without prejudice. However, before I do so, I want to hear counsel for both sides by brief and oral argument.

(Doc. #124, pp. 1-2). This Court ordered the initial briefs to be filed no later than Thursday, June 18, 2015. (Doc. #124, p. 2.)

### STATEMENT OF THE ISSUES

I.   **The repeal of the death penalty by the Nebraska Legislature in LB268 is expressly retroactive and applies to Mr. Lotter; therefore, if the law becomes effective and the intent of the Legislature is carried out, Mr. Lotter's representation under the specific provisions of 18 U.S.C. § 3599 for persons under sentence of death may become moot.**

II.  **IN THE ALTERNATIVE, as long as the effect of legislative abolition in Nebraska remains uncertain, Mr. Lotter's right to counsel and continued representation under 18 U.S.C. § 3599 in pursuit of clemency or any other available federal state or judicial post-conviction remedies, including those matters already approved by this Court *ex parte*, is decidedly *not* moot and dismissal would be inappropriate and would violate his right to counsel.**

### FACTUAL STATEMENT

On May 27, 2015, the Nebraska Legislature repealed the state's death penalty through passage of LB268, overriding the Nebraska Governor's veto. "Nebraska abolishes death penalty in landmark override vote," available at http://www.ketv.com/politics/nebraska-lawmakers-vote-to-abolish-death-penalty/33248914 (last visited June 15, 2015) (noting abolition bill and veto-override vote backed by coalition of conservatives). *See also* Mark Hyden, "Voices of the Governing Institute: *The Conservative Case against Capital Punishment*," GOVERNING MAGAZINE (June 12, 2015), available at www.governing.com (last visited June 15, 2015) (noting that the Nebraska abolition effort "was led by conservatives who oppose the death penalty for a variety of reasons, including its enormous cost . . . it has become a burden on taxpayers because the death penalty process, like so many other government programs, is wasteful and inefficient").

In pertinent part, LB268 eliminates the death penalty as an authorized punishment, eliminates the provision of indigents' defense services for capital cases, and defines murder in the first degree as a Class IA felony, for which the authorized punishment is life imprisonment.

NE Legis. 268, Sec. 1, Sec. 6, Sec. 9, Secs. 27-30 (Westlaw 2015). LB268 sets forth the legislative intent of the bill "that in any criminal proceeding in which the death penalty has been imposed but not carried out prior to the effective date of this act, such penalty shall be changed to life imprisonment." NE Legis. 268, Sec. 23 (Westlaw 2015). The Nebraska Attorney General confirmed in an opinion requested by Senator Colby Coash during legislative consideration of LB268 that, under Nebraska law, a sentence of life imprisonment means life imprisonment without parole. Attorney General's Opinion, No. 15-006 (citing *State v. Casteneda*, 287 Neb. 289, 313 (2014)).

## ARGUMENTS AND AUTHORITIES

I.  **The repeal of the death penalty by the Nebraska Legislature in LB268 is expressly retroactive and applies to Mr. Lotter; therefore, if the law becomes effective and the intent of the Legislature is carried out, Mr. Lotter's representation under the specific provisions of 18 U.S.C. § 3599 for persons under sentence of death may become moot.**

Mr. Lotter agrees with this Court's opinion that the repeal of the death penalty in Nebraska changes the landscape of this case, if the repeal goes into effect. He also understands the Court's desire to conserve the expenditure of federal funds, especially when such expenditure becomes moot and thus is no longer necessary. LB268, which is expressly retroactive, was passed on May 27, 2015 and will become law on August 30, 2015. At that time, the law should apply to Mr. Lotter and his death sentence will be reformed to a sentence of life imprisonment.

**A. Nebraska's repeal of the death penalty is expressly retroactive and applies to Mr. Lotter.**

As the Nebraska Supreme Court has stated on numerous occasions, "it is the Legislature's function through the enactment of statutes to declare the law and public policy and to define crimes and punishments." *In re Nebraska Community Corrections Council to Adopt Voluntary Sentencing Guidelines for Felony Drug Offenses*, 738 N.W.2d 850, 854 (Neb. 2007)

(citing *Stewart v. Bennett*, 727 N.W.2d 424 (Neb. 2007). *Accord*, *Polikov v. Neth*, 699 N.W.2d 802, 809 (Neb. 2005) (in defining crimes and punishments, the Legislature "sets broad policy goals of this state's criminal justice system, including whether for a particular type of crime the corrective goal should be retribution, deterrence, or rehabilitation). *See also State v. Stratton*, 374 N.W.2d 31 (Neb. 1985); *State v. Cutright*, 226 N.W.2d 771 (1975). Through enactment of LB268, the Nebraska Legislature has exercised its designated power by repealing the statutory Class I felony of first degree murder and defining first degree murder as a Class IA felony punished with life imprisonment, which, under Nebraska law, means life without parole. NE Legis. 268, supra, Sec. 6, Sec. 9. In so doing, the Nebraska Legislature has appropriately and legitimately declared the law and public policy of the Nebraska criminal justice system, and determined that the penological purpose of punishment for first degree murder is sufficiently achieved by serving a sentence of life imprisonment.

It is also within the legislative power to declare its intent and purpose that an enacted law should operate retrospectively. *See generally Smith v. Mark Chrisman Trucking, Inc.*, 829 N.W.2d 717, 722 (Neb. 2013) ("a legislative act operates only prospectively and not retrospectively unless the legislative intent and purpose that it should operate retrospectively are clearly disclosed"). The Nebraska Legislature clearly disclosed its intent and purpose that the repeal statute in LB268 should operate retrospectively to "any criminal proceeding in which the death penalty has been imposed but not carried out prior to the effective date of the act." NE Legis. 268, *supra*, Sec. 23. The clearly disclosed intent and purpose expressed by the Nebraska Legislature is that, when LB268 becomes effective, the provisions of the new law should apply to a person such as Mr. Lotter, who is currently under a sentence of death.

The Nebraska Legislature's power to define the crime and punishment for first degree murder and to express its clear intent that the repeal of the death penalty operate retrospectively is not undermined by Nebraska case law interpreting the separation of powers. That case law, holding that the state constitution's separation of powers is violated when the legislature has granted the judiciary discretionary power to reduce sentences after a case has become final, involves non-retroactive legislation in non-capital cases. *See*, *e.g.*, *State v. Phillips*, 521 N.W.2d 913 (Neb. 1994) (legislature could not grant judiciary discretionary power to reduce sentences after the case had become final, which usurps commutation power held by executive branch under Ne.Rev.St. CONST. Art. IV, § 13); *State v. Jones*, 532 N.W.2d 293 (Neb. 1995) and *State v. Bainbridge*, 543 N.W.2d 154 (Neb. 1996) (same). *See* Ne.Rev.St. CONST. Art. IV, § 13 (stating that Board of Parole "shall have power" of commutation in all cases of conviction, not "shall have *the* power").

The Nebraska Supreme Court has also held that whether a legislative change will be retroactively applied to a criminal case on post-conviction is determined by the regular rules of statutory construction, *i.e.*, whether the legislature expressed a "clear intention" that the change should operate retrospectively. *See State v. Reeves*, 604 N.W.2d 151, 520 (Neb. 2000) (as with statutory amendments, constitutional amendment applies retroactively in death penalty successor post-conviction case only if "the words employed show a clear intention that it should have a retrospective effect"). This is the same rule applied in the federal context, where the Supreme Court has recognized that the legislature may enact new rules that will apply retroactively to cases pending in federal habeas, after the conviction has become final. *See Lindh v. Murphy*, 521 U.S. 320, 325 (1997) (traditional rule of statutory interpretation requires retroactive application to be supported by clear statement of legislative intent). *See also Dorsey v. United States*, 132

S.Ct. 2321, 2335 (2012) (stating Congress has power to eliminate sentencing disparities by clear expression of intent to apply new law to proceedings concluded prior to law's effective date).

In any event, a legislative repeal of the death penalty is categorically distinct from legislating power to grant discretionary sentence reductions in *non*-capital cases. A law abolishing the death penalty is akin to a new rule that "plac[es] a certain class of individuals beyond the State's power to punish by death," and is the type of new substantive rule that, in the view of the Supreme Court of the United States, would be applicable to defendants on collateral review. *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989). *See*, *e.g.*, *State v. Mantich*, 842 N.W.2d 716 (Neb. 2014) (holding that *Miller v. Alabama*, 132 S.Ct. 2455 (2012), prohibiting mandated life without parole sentence for juvenile offenders, is a new substantive rule retroactive to cases on collateral review).

**B. Any future execution in Nebraska after the repeal is in effect would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.**

The Nebraska Legislature's repeal of the state's death penalty clearly indicates that "evolving standards of decency" no longer tolerate executions in the state. *State v. Mata*, 745 N.W.2d 229, 262 (Neb. 2008) (claim that execution would be unconstitutionally disproportionate in light of "evolving standards of decency" under Eighth Amendment and Nebraska Constitution is evaluated by examining "objective criteria . . . the most reliable of which" is state legislation). *See Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Trop v. Dulles*, 366 U.S. 86, 101 (1958) (Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society")). The passage of LB268 by an overwhelming margin in the conservative Nebraska Legislature is reliable, objective evidence of a societal consensus that the death penalty is disproportionate for all crimes under the Eighth and Fourteenth Amendments to the U.S. Constitution, and Article 1, § 9 of the Nebraska Constitution.

The Supreme Court of the United States and other state supreme courts have held that prospective repeals of the death penalty establish a societal consensus against that punishment. In *Atkins v. Virginia*, 536 U.S. 304, 314 (2002), the Supreme Court counted states that had prospectively repealed capital punishment for intellectually disabled persons as part of the growing national consensus against the execution of the intellectually disabled. Both Georgia Supreme Court and the Tennessee Supreme Court have concluded that pre-*Atkins* legislation enacted in their respective states prohibiting the execution of intellectually disabled offenders established a state societal consensus against such executions, even though the legislation in each state was prospective only. *Fleming v. Zant*, 386 S.E.2d 339 (Ga. 1989); *Van Tran v. State*, 66 S.W.3d 790, 805 (Tenn. 2001).

Moreover, there is a national consensus against post-repeal executions, whether the repeal has been judicially- or legislatively-imposed. When there is a national consensus against a particular sentencing practice referenced by objective indicia of society's standards, as expressed in legislative enactments and actual state practice, the Eighth Amendment bans the practice as cruel and unusual punishment. *Kennedy*, *supra*, 554 U.S. at 421. Here, the evidence comes from the number of states "that have addressed the suitability of imposing the death penalty" after it has been repealed. *Atkins*, *supra*, 536 U.S. at 313-316. Statistics about the number of executions are particularly informative in demonstrating whether the death penalty "is regarded as unacceptable in our society" for a given category of crime or offender. *Kennedy*, *supra*, at 433. In short, there is no evidence that a state has ever executed a prisoner after repealing its death penalty. *See Miles v. Maryland*, In the Court of Special Appeals of Maryland, No. 02155 (September Term 2013), Brief of *Amici Curiae* Legal Historians and Scholars in Support of Appellant (attached hereto as Appendix A). There is simply no precedent for carrying out an

execution after a state has abolished the death penalty. To do so would violate both historical and contemporary standards of decency. It would also represent the sort of random, arbitrary, purposeless extinction of human life that the Eighth Amendment forbids. *See Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring) ("the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed").

II. **IN THE ALTERNATIVE, as long as the effect of legislative abolition in Nebraska remains uncertain, Mr. Lotter's right to counsel and continued representation under 18 U.S.C. § 3599 in pursuit of clemency or any other available federal state or judicial post-conviction remedies, including those matters already approved by this Court *ex parte*, is decidedly *not* moot, therefore dismissal would be inappropriate and would violate his right to counsel.**

In its May 28 Order, this Court opined that this matter, and the appointment of federal counsel, should be dismissed if the death penalty repeal bill becomes effective. (Doc. # 124 p. 1.) However, because of certain actions and declarations by the Governor and the Attorney General following the passage of LB268 by the Nebraska Legislature, as well as the filing of a public referendum to repeal LB268 by a group calling themselves Nebraskans For the Death Penalty, Inc., whether the legislative repeal will become effective remains uncertain, and Mr. Lotter remains under a sentence of death. Under these circumstances, Mr. Lotter is entitled to counsels' continued representation and related services under 18 U.S.C. § 3599, and he will be irreparably harmed if he cannot proceed in accordance with the *ex parte* motion as approved by this Court.

**A. The Nebraska Governor is attempting to proceed with executions of those currently on death row in Nebraska by unlawfully obtaining drugs from a foreign manufacturer.**

Even before the final debate on LB268 in the Nebraska Legislature, Nebraska Governor Pete Ricketts announced that the state would proceed with executing the remaining individuals on death row in Nebraska, and that he would soon have a way of carrying out those executions.

Young, JoAnne, "*State still waiting for execution drugs*," LINCOLN JOURNAL-STAR (June 14, 2015) (attached hereto as Appendix B). Information obtained pursuant to open records requests showed that Nebraska Department of Correctional Services Director Scott Frakes arranged the purchase of 1,000 vials of sodium thiopental from HarrisPharma, run by a man in east India named Chris Harris, at a cost of $54,400.00, scheduled to arrive in Omaha on June 18, 2015. Nebraska has admitted that the drugs are not approved by the Food and Drug Administration (FDA). *Id.*; *see also* McDaniel, Chris, "*Nebraska Bought 300 Executions' Worth of Illegal Execution Drugs from a Foreign Supplier,*" BUZZFEED, available at www.buzzfeed.com (June 8, 2015) (attached hereto as Appendix C.)

The State of Nebraska has been down this road before. *See* "A Short History of Nebraska's Lethal Injection Drug Purchases"[1] (attached hereto as Appendix D). After publishing its three-drug lethal injection protocol calling for administration of sodium thiopental, pancuronium bromide and potassium chloride in 2010, the Nebraska Department of Correctional Services (NDCS) realized it would be unable to obtain domestic supplies of sodium thiopental. NDCS, through online research, came into contact with Chris Harris, who had no experience in the pharmaceutical industry but who nevertheless offered to sell sodium thiopental to departments of corrections in the United States. Nebraska was one of only two states to purchase drugs through Harris, and did so on two occasions. Nebraska's first purchase of sodium thiopental, in early November 2010, involved a payment of $2,056.00 to Harris, affiliated at the time with Kayem Pharma. The sodium thiopental Harris shipped was not FDA-approved and did not come from a facility registered with the FDA. When the shipment reached a United States

---

[1] Available at : http://www.aclunebraska.org/images/attachments/237_2015-5-22%20NE%20execution%20drug%20purchase%20history%20FINAL.pdf.

port of entry, it was temporarily held by the FDA but eventually released to NDCS in 2011. However, in November 2011, NDCS transferred the drugs to the DEA for destruction following the DEA's Letter of Admonition to the NDCS that the sodium thiopental had been imported improperly and would need to be destroyed.

NDCS turned to Harris a second time in May 2011. By then, Harris was no longer affiliated with Kayem and had no ready supplier of thiopental. In an email to the then-Director of the NDCS, Steve Urosevich, Harris bragged that he was the only person willing to export to U.S. jails but that he needed to get his customs clearing license because "even the customs agents wont (sic) work on a package of thiopental being sent to US Jails." Harris said he would be able to procure the sodium thiopental nonetheless, and charged the NDCS $5,411.00 for 500 vials of the drug.

Four months later, Harris again sold an illegal thiopental product to NDCS that was not from a properly registered facility and was not FDA-approved. While litigation ensued in the Nebraska state courts over the unlawful import of this unapproved sodium thiopental (*see State v. Mata*, 845 N.W.2d 287 (Neb. 2014)). Prithi Kochhar, the CEO of Naari Pharma, the company that had manufactured it, learned this sale of the company's product for use in executions. Mr. Kochar filed a lawsuit in Nebraska to try to reclaim the drugs. In a letter to the Honorable Michael Heavican, chief Justice of the Nebraska Supreme Court, Kochar explained that Harris had tricked his company by saying that the thiopental would be sold for medical use in the developing world, and that Harris "misappropriated our drugs and diverted them from their intended purpose and use." Kochar asked that his product be returned immediately to Naari. This second shipment of illegal sodium thiopental expired in 2013.

Meanwhile, in 2012, in a lawsuit filed against the FDA and the Department of Health and Human Services by a group of prisoners on death row in Arizona, California, and Tennessee for allowing state correctional departments to illegally import unapproved sodium thiopental, the United States District Court for the District of Columbia issued an order permanently enjoining the FDA from "permitting the entry of, or releasing any future shipments of, foreign sodium thiopental that appears to be misbranded or in violation of 21 U.S.C. []§ 355." *Beaty, Cook et al. v. Food and Drug Administration et al.*, 1:11-cv-00289-RJL, Docs. #24 and #29 (Attached hereto as Appendix E). *See also Beaty et al. v. Food and Drug Administration et al.*, 853 F.Supp.2d 30 (2012). In *Cook et al. v. Food and Drug Administration et al.*, 733 F.3d 1 (2013), the United States Court of Appeals for the District of Columbia affirmed the judgment of the district court. The Court of Appeals did vacate a portion of the district court's remedial order directing the FDA to "notify any and all state correctional departments which it has reason to believe are still in possession of any foreign manufactured thiopental that the use of such drug is prohibited by law and that, that thiopental must be returned immediately to the FDA," because not all state correctional departments had been joined as parties to the lawsuit. However, the Court affirmed the underlying judgment of the district court and left undisturbed the remainder of the district court's remedial order, including the permanent injunction. 733 F.3d at 3, 12.

Nebraska has now turned to Chris Harris a third time to illegally import unapproved sodium thiopental, this time at a taxpayer cost of $54,000.00. The FDA has announced that the importation of the sodium thiopental by Nebraska would be unlawful and that its admission into the United States would be refused. The announcement also stated that the FDA would work with U.S. Customs and Border Protection to export or destroy shipments of drugs it determines would be refused admission, and may refer the matter to the DEA. A DEA spokesperson has

since stated that DEA is "in sync" with the FDA on the importation of sodium thiopental from foreign companies, and that it would not allow importation of drugs that are not FDA-approved. Young, *supra*, LINCOLN JOURNAL-STAR (June 14, 2015). The Governor apparently is determined to import the drugs anyway. Duggan, Joe, "*For lethal injection drugs, Nebraska may try to skirt FDA,*" OMAHA WORLD-HERALD (June 12, 2015) (attached hereto as Appendix F). The federal government plans to seize them. McDaniel, Chris, "*The Federal Government Plans To Seize Nebraska's Illegal Execution Drug Shipment When It Arrives In the U.S.*," BUZZFEED, available at www.buzzfeed.com (June 17, 2015) (attached hereto as Appendix G).

**B. The Nebraska Attorney General has announced an intent to challenge the retroactivity provision in LB268.**

In addition to Governor Rickett's attempt to procure the illegal import of foreign manufactured sodium thiopental, the Nebraska Attorney General has announced an intent to challenge the retroactivity provision of LB268. The Attorney General has stated in press reports that he believes the provision is unconstitutional, and that Nebraska's Board of Pardons has exclusive power to change final sentences imposed by the courts. He has suggested that the challenge meets the standards for a declaratory judgment, and that he would file for such a ruling probably in September, or perhaps earlier. Young, JoAnne, "*Attorney General will seek clarification from courts on death row inmates*," LINCOLN JOURNAL-STAR (May 29, 2015) (attached hereto as Appendix H).

**C. A group called Nebraskans For the Death Penalty, Inc., has launched a referendum petition in an effort to repeal LB268.**

On June 1, 2015, a statewide voter referendum was launched, seeking a repeal of LB268. *See* Referendum Petition Regarding LB 268 (2015) (on file with Nebraska Secretary of State). The referendum petition was filed by a non-profit corporation, Nebraskans For the Death Penalty, Inc. *See* Joe Stuggan and Martha Stoddard, "*Omaha Councilwoman Aimee Melton*

*among Ricketts allies launching group to bring back death penalty*," OMAHA WORLD-HERALD (June 2, 2015) (attached hereto as Appendix I) (noting that the three leaders of the organization launching the voter referendum all have connections to Gov. Pete Ricketts). *See also* JoAnne Young, "*Group will seek signatures to put death penalty on the ballot*," LINCOLN JOURNAL-STAR (June 1, 2015) (attached hereto as Appendix J) (explaining that "[i]f the group is successful getting the required 10 percent of registered voters' signatures by August 27 . . . the law would not go into effect and the question of restoring the death penalty would be on the November 16 general election ballot[,]" and "[w]ith signatures of 5 percent of registered voters in 38 counties, the bill would go into effect three months from the end of the session, but voters would be able to vote in November 2016 on whether to repeal or restore the death penalty").

Although Mr. Lotter asserts that the U.S. and Nebraska Constitutions would bar his execution even if the Governor and his group were able to repeal the repeal, it is clear the Governor will keep attempting to execute him until the courts definitively say he may not. That moment has not yet arrived.

### D. Mr. Lotter will be irreparably harmed in violation of his constitutional rights if he is not allowed to proceed in accordance with his *ex parte* motion as approved by this Court, and with his right to counsel under 18 U.S.C. § 3599.

As outlined above in Issue II-A., B., and C., the status of Nebraska's death penalty repeal could be in flux, there are likely legal challenges forthcoming to its application to Mr. Lotter, and Mr. Lotter remains under threat of a sentence of death. As long as that is so, he is entitled to the continued appointment of counsel under 18 U.S.C. § 3599.

This Court has approved Mr. Lotter's *ex parte* motion requesting investigative and expert services to which he is entitled as part of the right to counsel under § 3599, subject to approval by Chief Judge Riley. *See McFarland v. Scott*, 512 U.S. 849 (1994) (discussing right to appointed counsel and related services in any federal post-conviction proceedings); *Harbison v.*

*Bell*, 556 U.S. 180 (2009) (authorizing federally appointed counsel to represent prisoner in subsequent state clemency proceedings). Mr. Lotter's motion sets forth substantial constitutional claims, never adjudicated on the merits, that he has been diligently pursuing, and for which this Court has found the requested services reasonably necessary, and which, if successful, will invalidate Mr. Lotter's death sentence. There are certainly judicial remedies available to Mr. Lotter seeking review on the merits, as this Court's approval of Mr. Lotter's *ex parte* motion impliedly acknowledges. *See*, *e.g.*, Fed.R.Civ.Proc. 60(b)(6) (motion seeking relief upon showing of "extraordinary circumstances" justifying reopening of final judgment); 28 U.S.C. § 2244(b)(3) (allowing second or successive federal habeas corpus petition presenting claim not previously raised that is sufficient to meet requirements of § 2244(b)(3)); 28 U.S.C. § 2254 (petition for writ of habeas corpus). *See also Gonzales v. Crosby*, 545 U.S. 524, 532 n. 4 (2005) (motion for relief from judgment under Rule 60(b)(6) does not attack a federal court's determination on the merits if it "merely asserts that a previous ruling which precluded a merits determination was in error – for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar"); *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007) (stating that Court has declined to interpret "second or successive" as referring to all § 2254 petitions filed second or successively in time); *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) (ineffective assistance of post-conviction counsel establishes cause for procedural default of substantial claim of ineffective assistance of trial counsel, allowing claim to heard on merits in federal habeas corpus); *Trevino v. Thaler*, 133 S.Ct. 1911 (2013) (same); *Christeson v. Roper*, 135 S.Ct. 891 (2015) (remanding to allow substitute counsel opportunity to show entitlement to equitable tolling under AEDPA's statute of limitations). In order to pursue any of these available remedies, Mr. Lotter must be able to access the services which this Court has approved as

reasonably necessary to his representation. Otherwise, Mr. Lotter is threatened with execution in violation of his constitutional rights.

## CONCLUSION

The repeal of the death penalty by the Nebraska Legislature, once effective, should apply to Mr. Lotter and his death sentence will be reformed to life imprisonment. Nevertheless, it is clear that the Nebraska Governor will attempt to execute him until the courts say he may not. Whatever steps the Governor may take, Mr. Lotter's execution would be unconstitutional under both the U.S. and Nebraska Constitutions. As long as Mr. Lotter remains threatened with execution, he is entitled to the continued appointment of counsel under 18 U.S.C. § 3599, and the related services in his *ex parte* motion as approved by this Court.

Respectfully submitted,

/s/ Rebecca E. Woodman
REBECCA E. WOODMAN
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, MO 64113
816-363-3795
rwoodman@dplclinic.com

/s/ Carol R. Camp
CAROL R. CAMP
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, MO 64113
ccamp@dplclinic.com

**CERTIFICATE OF SERVICE**

This will certify that, on June 18, 2015, this Brief has been electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

                                                /s/ Rebecca E. Woodman
                                                Dated: June 18, 2015
                                                Kansas City, MO